Choate, J.
These are cross libels to recover damages caused by a collision between the schooner Joseph Harwell and the steamboat John H. Starin, on the eighth day of November, 1877, about 6 o’clock in the evening, a little to the eastward of the southerly point of Hart’s island, in Long Island sound. The steamboat left New York at about 10 minutes after 4 in the afternoon on her regular trip for New Haven. The schooner was on a voyage from Rockland, Maine, to Baltimore, with a cargo of granite. The wind was about S. S. E., blowing a gale at a velocity of some 28 miles an hour. The schooner was making about eight knots an hour. The speed of the steamboat was about 12 knots. The tide was the last of the ebb, setting to the eastward. Both vessels had the proper regulation lights.
The case of the schooner, as stated in the pleadings, is that the schooner was on the port tack, close hauled, heading about south-west, when the steamer was seen about two points on the weather or port bow, showing both her red and green lights, and apparently about a mile and a half or two miles distant; that the schooner held her course until the collision; *102 that shortly after the steamer’s lights were seen her green light disappeared, the red light alone remaining in sight; that soon after that both lights came in sight, and remained visible for a short time, when the red light disappeared, and the green light was alone visible, and so remained to the time of the collision; that soon after the red light disappeared the steamboat gave a number of quick toots of the whistle, and almost immediately the schooner, which had not changed her course, ran into the starboard side of the steamboat just forward of the paddle boxes; that the collision was occasioned solely by the fault of the steamboat in not keeping out of the way of the schooner, and in attempting to cross her bows.
The case of the steamboat, as stated in the pleadings, is that after passing the Stepping Stones the course of the steamboat was changed so as to head for Execution Light, after that change heading north-east; that after running on that course for about four minutes the schooner’s green light was seen, and reported bearing two or three points on the starboard bow; that for greater caution the helm of the steamboat was starboarded, altering her course so that she headed about half a point to the northward of Execution Light, and that the two vessels were then proceeding on such courses; that there was no danger of a collision; that the steamboat kept on her course until the vessels were about 150 yards apart, when the red light of the schooner came into view, and the green light almost immediately disappeared; and that it then appeared that the schooner was changing her course and heading for the steamboat; that several blasts of the steamboat’s whistle were immediately blown, and the bells were rung to slow and stop, which were obeyed, but the schooner kept on and almost immediately the vessels came together; that the schooner at no time showed a flash light, and that she changed her course so that at the collision she was heading nearly west; that when and after the red light of the schooner came in view the steamboat could have done nothing to avoid the collision, but that even then the schooner could, by star-boarding, have gone clear under the stem of the steamboat, *103 or have made the blow more glancing, which would have lessened the injury caused by the collision.
It is admitted that the schooner did not show a flash light, but it is alleged on her behalf that there was no need to do so until the steamboat suddenly changed her course and ran across the course of the schooner, and that there was then no time to exhibit such a light.
The crew of the schooner consisted of the master, mate, two seamen, and a boy who served as cook. The master was at the wheel, the two seamen forward on the lookout, and the mate was on deck walking backwards and forwards, and the boy was below.
The master, mate, and two seamen, testify substantially to the same account; that after passing Execution Light, the schooner made a tack to the eastward and then was put upon her port tack, heading about south-west by the wind or one point free — Stepping Stones and Throg’s Neck Lights bearing a little on the weather or port bow; that they were on this tack when they made the steamer’s lights, although one or more of them think they may have seen the steamer’s lights while still on their tack to the eastward; that she was, when they first saw her on this tack, from a mile to two miles distant and showing both lights.
The mate alone puts her much nearer, but he testifies to the same changes in her lights, and bearing from the schooner, which the other witnesses testify to; that when they first saw her, after getting on their port tack, she bore about a point on their port bow; that the schooner kept her course till the collision, without any change whatever; that very soon after sighting her the green light of the steamer was shut out, and the red light alone remained visible, showing that she was passing them on their port side, and as she approached she bore more and more on the port side; that afterwards both lights appeared again for a short time, and then the green light alone, and then, almost immediately, the collision took place.
On the part of the steamboat, the pilot and assistant pilot *104 were in the wheel-house, and they, together with the lookout, were the only witnesses examined who observed the movements of the two vessels before the collision and, so far as appears, they were the only persons on deck who had any opportunity to observe what happened before the two vessels came together.
The story of the pilot and assistant pilot is that soon after passing Stepping Stones they put the steamboat on a northeast course, heading for Execution Light; that they made a vessel’s green light on the starboard bow at a distance which they estimate at from half to three-quarters of a mile; that they then starboarded so as to head a little to the north of Execution Light. The evidence of these two witnesses is very unsatisfactory as to the attention they paid to this light after they had thus starboarded, on its being reported. The next thing which they appear to have noticed was a red light very near them, not more than 150 yards distant, and two or three points on their starboard bow. Their testimony alone would not be sufficient to show that the red light, which was undoubtedly the port light of the Joseph Earwell, was on the same vessel with the green light which they had previously seen. It was their conclusion that it was the same vessel, but this conclusion is in no way warranted by their own testimony as to their observation of the green light after they first saw and altered their course to avoid it. Their inference was that after they had changed their course, and after the vessel bearing the green light got very near them, she suddenly changed her course from a south-west course to a course nearly west, running right down upon the steamboat.
The lookout testifies to seeing and reporting the green light on the starboard bow, and his testimony is that he continued to observe it as it approached, and that when it got very near it suddenly disappeared and the red light showed, and then the collision almost immediately happened.
This witness, therefore, confirms, from his observation, what with the other two witnesses appears to be a mere conclusion, that it was the same vessel which bore the green and the red light.
*105 It is entirely clear that the two stories cannot be reconciled. It is impossible that the schooner could have thus suddenly, and in the immediate vicinity of the steamboat, have changed her course to the westward, unless the four witnesses from the schooner are not only mistaken, but so entirely wrong, as to the schooner’s course, and as to what they saw of the movements of the steamer, that the error is not consistent with an intention to testify truthfully. No mere exaggeration of distance or confusion as to length of time can reduce the time and distance they ran on their last port tack to make it conform to what the witnesses from the steamboat think they saw — a sudden change of course and running down on the steamboat from a point 150 yards away, while well on the starboard bow of the steamboat.
Nor on that theory could those on the schooner have possibly seen the red light of the steamboat at all after they stood on their port tack, and they all testify positively to seeing first both lights, then the red light alone, then both lights, then the green light alone, all after getting on that tack. Such changes of the steamboat’s course, if seen as they testify, imply, necessarily, that the schooner ran a considerable distance, and is wholly inconsistent with the account given by those on the steamboat. Assuming the truthfulness of the witnesses on both sides, there is no improbability in the hypothesis that the green light which was seen from the steamboat was not on the Far well, but on some other vessel. There is evidence that there were other vessels in the vicinity. It is more probable that the lookout of the steamboat is mistaken in supposing, or in his recollection, that he kept his eye steadily on the green light, and that he saw the vessel that bore it shut it out and show her red light, than that the four witnesses from the schooner have testified falsely to what they did and what they saw.
As above remarked, the identity of the vessel bearing the green light with the vessel bearing the red light rests almost entirely on the testimony of the lookout. But, if forced to reject as false one story or the other, I should not hesitate to *106 hold that the account given by the schooner has the preponderance of the evidence.
The schooner’s witnesses are corroborated also by the testimony of the master and crew of the schooner Clara Sawyer, which was following in her wake before the collision.
Great importance is given by the learned counsel for the steamboat to the confusion in the testimony on the part of the schooner’s witnesses, and of those from the Clara Sawyer, as to the place where the schooner made her tack to the eastward before she stood on her port tack upon which she was lost; and a very ingenious theory is constructed from the testimony, that this tack to the eastward was not made till the schooner found herself close to the southern point of Hart’s island, and that she beat across, well towards the eastern part of the channel, before standing westward again. This might account for her showing to the steamboat her green light while on her eastward tack, and would necessarily make her port tack very short, and bring her on the starboard hand of the steamboat upon her last tack.
There are, however, several objections to this theory. In the first place, it is wholly inconsistent with the positive evidence of four witnesses, apparently truthful, as to the time and distance they stood on the port tack, and as to what they saw while standing upon that tack. In the next place, there was nothing especially to fix in the minds of the witnesses the time and place of making this eastward tack, and it is no way surprising that some of them concluded, from their idea that it was taken to avoid Hart’s island, that it was made when they were nearer to the island than they really were. It was a movement and event more remote from the collision than the movements and events happening on their last tack. And it is observable as to a collision that the startling character of the event serves to fix more certainly in the mind what happens immediately before it than what is more remote in time and space. Consequently we often find a hopeless confusion in attempting to determine the course of events that preceded the immediate occurrences, partly, no doubt, because *107 the memory afterwards is far more retentive of those events that were immediately connected with the collision than those more remote; but also partly because the collision itself arrests the attention of the parties at the time and fixes the immediate course of events with greater certainty of observation than the same persons are ordinarily in the habit of using; and» finally, this theory is clearly inconsistent with the libel and answers put in on the part of the steamboat.
In the libel against the schooner it is alleged “the green light only of a vessel, which afterwards, proved to be the0 schooner Joseph Farwell, was seen and reported by the lookout, and was at the same time,, or a little before, seen by the pilot. Such light, when seen, bore from two to three points on the starboard bow of the steamboat. With the wind as it was, the said schooner could have held, without difficulty, the regular course of that reach of the channel which she was bound to do, viz.: a course parallel to the course of the steamboat; and, inasmuch as she was on the starboard bow of the steamboat, showing her green light, no collision could have occurred if said schooner had held her course.”
This statement clearly implies that when the green light was seen the schooner was running nearly on the opposite course to that of the steamboat, that is, nearly south-west, and continued on that course till she suddenly changed her course more to the westward, and ran into the steamboat. It is impossible, therefore, that the sudden change, almost under the bows of the steamboat, should have been a change from an eastward tack to a westward tack.
It is stated as a change from a westward tack by the wind, or nearly so, to a course more off the wind to the westward. And if, when first seen, she had been standing to the eastward, she would have seemed to those on the steamboat to be moving almost directly across their course, which evidently was not the case, as they state it in their pleadings. It is clear, therefore, from the pleadings of the steamboat, that she admits the schooner was for half or three-quarters of a mile, after being seen from the steamboat, on her port tack, and *108 the only questions are, what lights did they show each other, and did the schooner, while on that tack, change further ttí the westward just before reaching the steamboat ?
There is neither probability nor evidence to support such a hypothesis. The testimony is clear that, though a dark, windy, and stormy night, lights could be easily seen, and I have no doubt that the schooner’s light must have been visible at least a mile off to those on the steamboat; probably considerably more.
Upon the whole testimony, I think, it is clearly proved that the schooner kept her course on her port tack for at least a mile until the collision, showing her port light, and that the steamboat, without observing it, changed her course at least twice after she came in sight, for some reasons not fully explained — probably in consequence of seeing other vessels; that she was negligent in her lookout, and did not observe the Farwell till she saw her red light on her starboard bow, and so close that it was too late to avoid a collision, although she then rung to slow and stop; and that, therefore, the fault was with the steamboat and not with the schooner. Nor is there any force in the claim of the steamboat that the schooner should, when she saw that the collision was imminent, have starboarded to avoid the consequences of the steamboat’s mistake. The cases in which a vessel is bound to disobey the positive rule which requires her to keep her course on meeting a steamer, and in which she is chargeable as for a fault in not doing so, are very rare indeed, if any such case ever occurs. The Havre and The Scotland, U. S. Circuit Court, S. D. New York, unreported.
One question still remains: Was the schooner in fault in not showing a flash light ? The rule requiring a sailing vessel in the night-time to show a light on that “point or quarter” towards which a steam vessel is approaching, (Rev. St. § 4234,) has its most obvious application to the case of a steam vessel approaching a sail vessel from abaft the beam, where the sailing vessel’s regulation lights do not show. Independently of the rule, there is authority for this requirement *109 in situations where it would be a prudent course to adopt; yet it seems hardly possible to restrict the statute by construction to that application, notwithstanding the use of the word “quarter.” It is clear, however, that the rule applies only to a ease where the close vicinity of the steamer is such that it can be said that she is approaching some particular point on the sailing vessel. That, obviously, cannot be said of a steamer a mile away, for instance, although both her lights are seen. At that distance it could not be said that the steamer was approaching any particular point of the vessel. So, I think, the rule implies that the movement of the steamer shall have sufficient steadiness in its approach to be seen by those on the sailing vessel to be approaching a particular point. The rule is that the light is to be shown at the point towards which she is approaching. If the movement of the steamer’s lights is such as to show that she is swinging rapidly across the sailing vessel, especially where the sailing vessel presents her bow to the steamer nearly head on, it can hardly be said that she is approaching any particular point. The point is, in that case, constantly shifting. And if the lights of the steamer are such as to indicate that she is on the swing, and the observation is not aided by seeing her bow or hull at all, there can be no certainty in the minds of those on the sailing vessel as to the point at which they should display the flash light, and showing it would be as likely to mislead as to aid the steamer, which has, at the time, full opportunity to discover the position and course of the sailing vessel by her colored light, which is in full view.
In the present case it is true that there was a time shortly before the collision when both lights of the steamer were in view from the schooner.
Their coming in view, from seeing the red light only, showed that she was changing her course, and that her bow was pointing towards the schooner; but it is not shown that then her hull or bow was visible so as to enable those on the schooner to determine towards what particular part of the schooner she was pointing. And before, so far as the proof goes, this *110 could be determined with reasonable certainty and a flash light shown, she had swung so far that the red light was no longer visible. It is difficult to find from the evidence how far off she was while thus showing both lights, or during what length of time she showed them. The time was, however, very short, and the event showed that she was during that time constantly on the swing under a starboard wheel.
I think, upon all the evidence, that the showing of a flash light would not have aided in avoiding the collision. When it could first have been properly shown, if at all, the steamer was swinging around across the schooner’s bow, under a starboard helm, in such a way, and the vessels were coming together with such speed, that there is no reason to believe that the collision would have been avoided, although by porting the steamer might have struck the schooner, instead of the schooner striking the steamer on her starboard Bide as she did. Moreover, I do not think it can be fairly said that there was any particular point on the schooner which, so far as those on the schooner could see, the steamer was approaching, at which they could, conformably to the rule, show the light. For these reasons I think this defence of the steamboat is not made out. See The Leopard, 2 Lowell, 288.
Decrees for the libellants in the two suits against the steamboat, with costs, and reference to compute damages.
Decree for the claimants in the Buit against the schooner, dismissing, the libel, with costs.