THE MINNIE.

(District Court, E. D. Virginia. May 2, 1898.)

1. COLLISION—VESSEL AT ANCHOR—FOG SIGNALS—EVIDENCE.

On the question whether an anchored vessel was negligent in not ringing the fog bell during a snow, the fact that numerous other vessels anchored in the same vicinity were not ringing them is entitled to weight, as tending to show that the weather was not thick enough to require it.

2. SAME—SHOWING TORCH.

Rev. St. § 4234, requiring sailing vessels to show a lighted torch to steam vessels approaching at night, does not apply to vessels at anchor.

3. SAME—TUG AND TOWS WITH ANCHORED SCHOONER.

A tug with a long tow, entering a frequented roadstead at night in such a way as to bring one of the barges in the tow into collision with a schooner at anchor, and sink the latter, *held* in fault for insufficient lookout, and for careless handling; and the schooner *held* not in fault for not ringing a bell, it not appearing that the weather was thick enough to obscure her lights, or for not showing a torch, as required by Rev. St. §.4234, the facts not bringing the case within that rule.

This was a libel in rem by Henry A. Haines, master of the schooner John C. Haynes, against the steam tug Minnie, to recover damages caused by a collision.

Bickford & Stewart, White & Garnett, and Sharp & Hughes, for libelant.

Samuel Park and Whitehurst & Hughes, for respondents.

BRAWLEY, District Judge. The schooner John C. Haynes, loaded with coal, was lying at anchor in Hampton Roads, on the night of

February 6, 1895, at a point from one-half to three-quarters of a mile southwest of the wharf at Fortress Monroe. This is a capacious roadstead, and that it was a proper and safe anchorage ground was expressly decided in The J. W. Everman, 2 Hughes, 17, Fed. Cas. No. 7,591. The steam tug Minnie, having in tow the barges Volunteer and Puritan, passed the Haynes on the morning of February 7th, about 5:10, the Volunteer striking her bowsprit, and the barge Puritan struck the schooner on the port bow, and sunk her. As the proof clearly shows that the schooner had her regulation anchor light, and that it was brightly burning at the time of the collision, and as the law is clear that a vessel propelled by steam and in motion is bound to steer clear of a vessel at anchor, the burden of proof is upon the tug to show that she is without fault, or that the schooner contributed to the disaster, or that the same was the result of inevitable accident. The chief fault attributed to the schooner was her failure to ring her bell. As the international rules have no application in these waters, the measure of duty in this regard is fixed by rule 15 (section 4233, Rev. St.), which is as follows:

"Whenever there is a fog or thick weather, whether by day or night, fog signals shall be used as follows: * * * Steam vessels and sail vessels when not under way shall sound a bell at intervals of not more than five minutes."

All the witnesses agree that the weather was cold and freezing, and as a fog is caused by evaporation, which could not have been produced under the prevailing conditions, and as the more credible witnesses have not testified to the existence of a fog, it will be sufficient to consider whether there is sufficient proof of "thick weather" to require condemnation of the schooner for her failure to give the usual fog signals, it being admitted that the bell was not being rung at or near the time of the collision. A great many witnesses have been examined as to the state of the weather at and near the place of collision, and there is the usual conflict of testimony on that point. That a heavy snow had fallen during the night is clearly proved. That the fall was lighter and intermittent about the time of the collision seems also to be established. By the new international rules, snow is treated as fog; but as this case is not governed by those rules, and in the absence of proof of a usage or custom of vessels at anchor to ring bells in snowy weather, I cannot hold a vessel at fault for failure to ring, without clear evidence that such snow prevents the visibility of lights, in which case the exigency of the fifteenth rule requiring bells to be rung in "thick weather" would apply, for the ringing of a bell is obviously intended to give that notice which cannot be had by the vision. The majority of the disinterested witnesses nearest the scene of the collision seem to agree that the weather was not thick enough to prevent lights being seen. Of the twelve or fifteen vessels lying at anchor in the roadstead, only one was ringing her bell. The bell at the Fortress Monroe Light was not rung. This was the lighthouse nearest to the point of collision. A majority of the masters and crews of the vessels lying nearest the schooner have testified that lights were easily visible; that the weather was not thick enough to demand the ringing of bells. It was suggested in the argument that there is a certain bias

in the masters of sailing vessels in favor of the schooner as against the tug. However that may be, and whatever consideration should be given to the suggestion in determining the weight of their testimony, this alleged bias could not have affected their actions; and what men do is often of more consequence in determining the truth than what they say. That they did not ring their bells sufficiently establishes the fact that they did not consider the weather such as to require it. It is true that they, too, may have been negligent, and their concurring negligence would not excuse the libelant; but it is scarcely to be believed that so many of them would have neglected a precaution enjoined by the statute, and upon compliance with which depended their own safety.

I will not undertake to state in detail or to analyze the testimony, for, inasmuch as I did not have the advantage of seeing or hearing any of the witnesses, it would not assist any court which may be called upon to review the correctness of my conclusions. I am of opinion that the claimant has failed to show by a preponderance of testimony that the weather was such as to require the ringing of bells or other fog signals, and I am of the opinion, further, that this alleged negligence was not a contributing cause to the collision. The disaster occurred before daylight on the morning of the 7th of February. Whatever the amount of obstruction at the time of its actual occurrence, all agree that it was not clear; and all agree that up to about 4 o'clock there was a heavy snowstorm, that there was a flood tide, and a strong wind. The weather reports show a northeast wind, of a velocity of about 20 miles an hour. The Minnie was entering the roadstead, used habitually in rough weather as a harbor of refuge. Her master was familiar with such use. It was to be expected that many vessels would be at anchor there. The testimony shows that there were 12 or 15. All of the circumstances were united which demanded extreme vigilance. The Minnie was carrying two seagoing barges, with sharp-pointed iron prows. To the first barge there was a hawser of 175 or 180 fathoms; to the second barge a hawser of 140 or 150 fathoms; each barge being 180 feet in length. In the absence of a statute or regulation by authorities charged with such duty, the courts should not undertake to lay down any hard and fast rule governing the length of hawsers. The testimony in this case shows that such length of hawser was not unusual. It also shows that, since this occurrence, the company, which is the owner of the Minnie, has made a regulation of its own directing the length of hawsers to be 30 fathoms. It is sufficient to say that, in such weather as prevailed, such great length of tow was unmanageable, or at least unmanaged. There was safe anchorage ground below, either under the lee of Cape Charles, before entering the roadstead, or near the Thimble, where two vessels were at anchor, and the testimony shows that the barges passed so near as to almost touch them. With all the conditions demanding uncommon vigilance, it is found that the lookout on the Minnie, whether from native inaptitude or because his faculties were benumbed by cold and fatigue, for he had been on duty over five hours in a most exposed place during most severe weather, neither saw nor heard what it is

the obvious duty of the lookout to see and hear. The other lookout has left the country, and was not examined. The mate of the schooner testified that he saw the lights of the Minnie a mile off. The lookout of the Minnie did not report the schooner's light at all. Her captain and mate were both on duty in the pilot house. Her captain did not see the light until she was about 400 feet off his starboard beam. The mate saw her on his starboard bow about two points,— a "couple of hundred feet or so ahead."

From this testimony I conclude that there was not that vigilant lookout demanded by the occasion, and I am also forced to the conclusion that there was a lack of seamanship on the part of the master of the Minnie after the schooner was discovered; for he kept his course, as he says, not apprehending that there was any danger, keeping no lookout in the stern, so as to direct the movement of his barges, and not knowing until he anchored his first barge, a half hour afterwards, that the second barge had been cut off or that a collision had taken place. That it is the obvious duty of a navigator to have a knowledge of, and to calculate the effect upon his tow of, the wind and tide, will scarcely be disputed. If the wind had suddenly sprung up, there might have been some excuse, but such was not the case here. Whether he could have hooked up, and, by starboarding his helm, pulled the barges away from the schooner, need not be determined, though it seems to me that such manoeuver would have been successful. He did not attempt it, because he believed that there was no danger. The event proved that there was danger, and all of the circumstances were such as should have aroused the vigilance of a prudent seaman.

The absence of an anchor watch on the schooner is complained of, but the proof does not sustain the charge. That the mate and others hallooed to the approaching barge, calling upon it to throw over its anchor, and in all ways possible endeavored to avert the danger, cannot be seriously controverted; and it is difficult to see what an anchor watch could have done that was not done.

It is also charged that the schooner failed to show a torch, as required by section 4234 of the Revised Statutes. The facts proved do not bring this case within the exigency of that rule. The John H. Starin, 2 Fed. 100, and The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, are cases which discuss the application of this rule, and show that this was not a case falling within it.

In undertaking to tow these barges in a roadway where the presence of shipping was reasonably to be expected, with a hawser so long that it was practically unmanageable, with tows liable at all times to a sudden sheer, putting in jeopardy all anchored vessels, which were helpless to protect themselves, I am of opinion that there was a lack of that caution and foresight which the law demands of vessels navigated by steam; and, in so far as the testimony of the claimants is to be believed that the weather was so thick as to prevent the visibility of lights, there is an aggravation of his carelessness. With such a wind and tide it seems to be sheer recklessness and a trusting to luck which calls for condemnation. If it had been necessary for his own safety to pass through, and he had displayed great

vigilance and seamanship in the attempt, it might have been excused; but such were not the conditions, and I must therefore hold the Minnie at fault. The John H. May, 52 Fed. 882; The Ludwig Holberg, 157 U. S. 70, 15 Sup. Ct. 477; The Syracuse, 12 Wall. 172; The Michigan, 11 C. C. A. 187, 63 Fed. 288; The Oregon, 158 U. S. 193, 15 Sup. Ct. 804; The Rockaway, 19 Fed. 452. A reference to a commissioner to compute the damages may be had if counsel do not agree, and a decree will be entered in favor of the libelant.