THE WILBERT L. SMITH.

(District Court, W. D. Washington, N. D.   October 20, 1914.)

No. 4553.

1. COLLISION (§ 8*)—HARBORS—MUNICIPAL ORDINANCES REGULATING ANCHORAGE.

A local ordinance prohibiting the anchorage of vessels within certain limits in a harbor without permission from the harbor master is valid, and a vessel which fails to comply with the same is liable for the consequences.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 7; Dec. Dig. § 8.*]

2. COLLISION (§ 81*)—RULES FOR PREVENTING—DUTY TO MAINTAIN LOOKOUT IN FOG.

Under the general admiralty rules it is the duty of every vessel, when navigating in a fog, to maintain a lookout in a proper position, who shall be charged with no other duty; and every doubt as to the performance of such duty, or the effect of nonperformance, should be resolved against the vessel in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 157–166; Dec. Dig. § 81.*]

3. COLLISION (§ 102*)—MOVING AND ANCHORED VESSEL IN FOG—COMMON FAULTS.

A tug, moving at about five miles an hour in Everett Harbor in a fog, came into collision with a schooner anchored in a part of the harbor forbidden by a local ordinance, and which was not giving the fog signals required by article 15 of the Inland Navigation Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 99 [Comp. St. 1913, § 7888]). There was no lookout on the deck of the tug. *Held*, that both vessels were in fault, the tug for excessive speed and failure to maintain a lookout, and the schooner for violation of the anchorage ordinance and the rule as to fog signals, and were equally liable for the damages.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

4. COLLISION (§ 77*)—"LOOKOUT"—DUTIES.

A "lookout" is a person who is specially charged with the duty of observing the lights, the sounds, and the echoes, with that thoroughness which the circumstances admit. His sole duty must be that with which he is charged, and he cannot divide this responsibility with the duties of any other person about the ship.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*

For other definitions, see Words and Phrases, First and Second Series, Lookout.]

In Admiralty. Suit for collision by the Everett City Tugboat Company, owner of the tug Mountaineer, against the American schooner Wilbert L. Smith. Both vessels held in fault, and decree dividing damages.

William H. Gorham, of Seattle, Wash., for libelant.

H. R. Clise, of Seattle, Wash., for claimant.

NETERER, District Judge. Libelant's tug Mountaineer, of 55 tons gross, proceeding from the Improvement Company's dock at Everett, crossed Everett Harbor to Priest Point, on October 16, 1911, and came

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

into collision with the schooner Wilbert L. Smith, laden with a cargo of 900,000 feet of lumber, anchored west of the Great Northern dock, upon ground forbidden by city ordinance of the city of Everett. There was no lookout on the deck of the tug. The master, assisted by the mate, was in the pilot house. The usual speed of the tug was eight miles per hour. At the time of the collision it was making about five miles per hour. The sea was calm and the tide was flooding. The captain of the tug said:

"I squared around and shaped my course, and when I blew the long whistle I was about 500 or 600 feet, or something like that, off the end of the dock."

He states that the atmosphere was—

"perfectly clear where we were, and probably—well, I should judge—we were about 500 or 600 feet from the edge of the fog bank. Just as we entered the fog, I put up my hand to blow a third blast. However, I didn't blow it, because I saw a dark object in front of me, and I said to the mate—I said, 'There is something ahead of us; a schooner of some kind.' I pulled the wheel around aport and gave the engineer the danger signal in the engineer's room. The collision happened about 15 or 20 seconds afterwards."

The impact caused the boiler to shift, broke the steam pipes, permitting the steam to escape, "the steam valve blew the floor" over the boiler "up into the room," and the concussion killed the dog which was in the room. Libelant seeks to recover $2,016.09 damages resulting because of necessary repairs and demurrage.

It is contended that the schooner had anchored on forbidden ground, and gave no fog signals of any kind, and solely because of these overt acts recovery should be had. An examination of the testimony convinces me that claimant did not ring any bell or sound any fog whistles as required, or at all. While there is testimony of the watchman that he did ring the bell every minute from midnight until the time of the collision, the testimony, to my mind, is overwhelming against this contention. While positive testimony should always receive greater consideration and have greater weight than mere negative testimony, yet from the facts of this case it is established that at least 13 witnesses, some of them disinterested parties, who were in a position to hear, testified that they did not hear any bell or signal of any kind. The crew upon the schooner, who were in a position to hear, did not testify as to hearing the bell, and yet one of the members of the crew was called and testified at the hearing, but was not asked as to the ringing of the bell, nor is any reason given why they did not testify. The fact that this boat was attached in this proceeding on the very day of the collision emphasized the incident in the minds of all who knew with relation to it. The circumstances surrounding a case where the action is commenced immediately charge the minds of the persons who know with relation to the matter with the facts as they actually occurred; whereas, if the action had not been commenced until some time subsequent to the collision, the court would give very little, if any, weight to the negative testimony, unless it was shown by circumstances surrounding that the facts were impressed upon the minds of the witnesses.

[1] I likewise think that the testimony establishes by a fair preponderance that the schooner was on forbidden ground. That the provisions of such an ordinance will obtain, and seamen must regulate their conduct with relation to it, is sustained by The James Gray, 62 U. S. (21 How.) 184, 16 L. Ed. 106, in which the court says:

"The power of the city authorities to pass and enforce these two ordinances is disputed by the libelants. But regulations of this kind are necessary and indispensable in every commercial port, for the convenience and safety of commerce. And the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor, and for what time. * * * They are like to the local usages of navigation in different ports, and every vessel, from whatever part of the world she may come, is bound to take notice of them and conform to them."

The same court, in United States v. Transportation Co., 184 U. S. 255, 22 Sup. Ct. 350, 46 L. Ed. 520, said:

"Anchoring vessels of the United States in an unusual and improper position in a harbor, in total disregard of usages and requirements of the court requiring notice to the harbor master of the intention to anchor, constitutes negligence on the part of the officers of the vessel, which will render the United States liable in the Court of Claims for damages thereby caused to other vessels navigating the harbor."

A vessel failing to comply with local harbor requirements with relation to anchorage is liable for consequences of such violation. The Amiral Cecille (D. C.) 134 Fed. 673. Section 1 of Ordinance No. 845, City of Everett, provides:

"It shall be unlawful for the master or person having charge of any ship * * * to allow the same to be moored or lie at anchor in the waters of Port Gardner Bay within the jurisdiction of the city of Everett without first having permission in writing from the harbor master within the following limits."

The vessel was within the prohibited limits. No permission of the harbor master was obtained.

A vessel not on prohibited ground, but in a fairway, failing to give warning of her presence, is liable for resulting damages. The Fristad (D. C.) 51 Fed. 766. And the precautions to be taken must be commensurate with the danger such vessel presents to shipping. The Europe (D. C.) 175 Fed. 596.

Article 15 subdivision (d) of Pilot Rules for Inland Waters, prescribed by the government (30 Stat. p. 99), provides:

"A vessel when at anchor shall, at intervals of not more than one minute, ring the bell rapidly for about five seconds."

Article 16 of the same act provides that:

"Every vessel shall, in a fog, * * * go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

[2] It is strongly contended that the libelant, not having a proper lookout and moving at an excessive rate of speed, was the direct cause

of the collision. It has, in admiralty, long been the established rule of due care that vessels navigating in a fog, or in the nighttime, shall have a competent lookout.

"Steamers are required to have constant and vigilant lookouts stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must actually be employed in the performance of the duty to which they are assigned. They must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of that duty. Proper lookouts are competent persons other than the master and helmsman, properly stationed for that purpose, on the forward part of the vessel; and the pilot house in the nighttime, especially if it is very dark, and the view is obstructed, is not the proper place." The Ottawa, 3 Wall. 269, 18 L. Ed. 165.

[4] A lookout is a person who is specially charged with a duty of observing the lights, the sounds, and the echoes, with that thoroughness which the circumstances admit. His sole duty must be that with which he is charged, and he cannot divide this responsibility with the duties of master or that of any other person about the ship. And it is the duty of the courts charged with admiralty jurisdiction to give the fullest effect to such duty when the circumstances are such as to call for its application, and every doubt as to the performance of the duty or the effect of nonperformance should be resolved against the vessel in the fault until the contrary is shown by the testimony. The Ariadne, 13 Wall. 475, 20 L. Ed. 542; Wilder's Steamship Co. v. Low, 112 Fed. 172, 50 C. C. A. 473; J. C. Ames (D. C.) 121 Fed. 918.

Article 29 of the regulations for preventing collisions upon harbors, rivers, and inland waters in the United States, supra, provides:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences * * * of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seaman, or by the special circumstances of the case."

"The lookout should be charged with no other duty than that to which he is assigned, and in that duty he should be actually, vigilantly, and continuously employed, without having his attention distracted by any other services." City of Philadelphia v. Gavagnin, 62 Fed. 617, 10 C. C. A. 552.

"The tug had no lookout, and the question is whether she has sufficiently excused herself for the omission. In the proper exercise of his duties, the lookout should have been located about 15 feet ahead of the pilot house, where the pilot was stationed while navigating the vessel. The lookout would have had a somewhat better view ahead than the pilot, and should have been exclusively engaged in watching." Erie R. Co. v. Oceanic Steam Nav. Co. (D. C.) 121 Fed. 440.

"The statement that it is not customary for tugs to maintain a more vigilant lookout than this tug had is immaterial. The law determines their duty in this respect, and they cannot avoid it without becoming responsible for the consequences." The George W. Childs (D. C.) 67 Fed. 272.

"If tugs will go about the harbor without lookouts, they may not expect that the court will conjecture nicely what would have happened if a lookout had been in his place, doing his duty, when a collision occurred." The Arthur M. Palmer (D. C.) 115 Fed. 417.

"There is no exception to the rule requiring a lookout in favor of craft capable of committing injuries, on account of size." The Marion (D. C.) 56 Fed. 271.

The presumption of law is against the moving vessel in collision cases, and the burden is upon such moving vessel to show that it was not at fault, but that the fault was the result of the negligence of the anchored vessel. Hughes on Admiralty, page 261; The Minnie (D. C.) 87 Fed. 780; The Worthington (D. C.) 19 Fed. 836; The Northern Queen (D. C.) 117 Fed. 906, 914. And where there is a reasonable doubt as to which party is at fault, the loss must be sustained by the party on whom the burden rests. Lockwood v. Grace Girdler, 74 U. S. (7 Wall.) 196, 19 L. Ed. 113.

[3] The testimony in this case does not vindicate the libelant from culpability. While the claimant was negligent in anchoring the vessel in the forbidden ground, and also in failing to give the signals as required, I am not prepared to say that the libelant's tug was not moving at a greater speed than the circumstances warranted, under the law and the condition of the fog, and, further, that the failure to have a lookout on its bow would not have avoided the collision. I therefore think that the parties were equally culpable, and that this is a proper case for the division of damages; each bearing one-half of the damage and paying one-half of the costs.

A decree may be presented accordingly.