**THE MARY T. TRACY. THE WALTER TRACY. Petition of TRACY et al.**

(District Court, S. D. New York. October 19, 1920.)

1. **Collision ⚭74—Evidence held to show both tug and steamer were at fault.**

   Evidence of a collision, resulting in loss of the tow, *held* to show that both leading tug, navigating on a night when the wind was high and navigation was difficult, and a steamer, that was stationary, but projected into the channel, obstructing the fairway, were at fault.

2. **Collision ⚭77—Tug must have deck hand with sole duty to maintain lookout.**

   It is the duty of a tug, navigating in a severe wind, to have a deck hand on deck whose sole duty is to maintain a lookout.

3. **Collision ⚭115—Tug, acting under direction of leading tug, exempt from liability.**

   A helper tug, which performed its task under orders and directions of master of leading tug, and whose master had no power nor discretion, *held* exempt from liability.

4. **Collision ⚭25—Tug which was not in privity with other vessels entitled to limitation.**

   Where there was no privity as to a collision with a steamer, resulting in loss of tow, *held*, that leading tug may properly avail itself of limitation.

In Admiralty. In the matter of the libel and petition of Thomas Tracy, as owner, and the Tracy Towing Line, Inc., as charterer, of the steam tugs Mary T. Tracy and Walter Tracy, their engines, etc., for limitation of liability. Decision rendered.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for petitioner.

⚭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Macklin, Brown, Purdy & Van Wyck, of New York City (William F. Purdy, of New York City, of counsel), for claimants M. & J. Tracy, Inc., and O'Boyle.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and Carleton L. Marsh, both of New York City, of counsel), for claimant.

Burlingham, Veeder, Masten & Fearey, of New York City (Frederick Pennell, of New York City, of counsel), for Dot Ferenedo Dampskibs Selskab.

MAYER, District Judge. At about 12:45 on the morning of January 24, 1919, Capt. Brown, in command of the leading tug Mary Tracy, with the Walter Tracy as a helper tug, started with a tow of 16 coal boats from Arlington, N. J., bound for New York. There had been a fog, but the weather indications fully justified the master in starting out. The tow was made up by placing the largest boats ahead, four wide in the first three tiers, three wide in the fourth tier, and one boat in the fifth tier. The boats were made fast to each other with spring lines from each corner of the bows to each corner of the sterns to the boats ahead, and there were bow and stern breast lines leading across from the boats to their respective tiers. There were two hawsers, about 275 feet long, from the after stern bitts to the middle bitts on the outside boats of the head tier. The Walter Tracy was ahead and alongside the Mary Tracy, with no line to the tow.

[1] The formation of the tow and the arrangement of the tugs were proper, and, although there was some difference of opinion as to the propriety of the location of the helper tug, the more experienced witnesses, including Capt. Brown, fully satisfied me that this disposition was consonant with good practice. Capt. Brown has been navigating around New York since about 1905. He is an able and clear-minded master, and his appearance and manner impressed me very favorably.

The tugs and tow reached Shooters Island about 1:45 a. m., and up to that time nothing unusual had occurred. When Brown left Arlington the tide was flood. As Brown came across to the westward of Shooters Island, and when he "got pretty near to the island," he noticed "the breeze freshening up a little bit." Being shielded going between Shooters Island and Mariners' Harbor, all went well until the craft "got going across Newark Bay. While crossing Newark Bay the wind was from the northwest, blowing very hard and coming up suddenly and without warning. The tide had started to run ebb, and according to the calendar it should have been slack water, or just a little running in, and this unexpected condition is accounted for by the strong northwest wind driving the water out of Newark Bay. As the Tracy tugs passed out from the lee of Shooters Island, they met the full force of the wind blowing down the open reaches of Newark Bay. The tide was strong enough to drive the flotilla "out of the bay and down by" the Bergen Point light.

Brown continued the way he was heading, toward the New Jersey shore. The wind struck the tow broadside and the tide was running strong ebb. A northwest wind and the ebb tide thus created would

298 F.—34

drive the tow towards Staten Island, and both forces would tend "to set" the tow on the National Dry Dock pier. The breadth of the water surface is about 1,000 feet, but for deep-draft tugs and tows the channel is much less; for the Bergen Point reef extends far out, and there is a rock shoal spot in mid-channel, marked by a red buoy, so that the navigable water is narrowed about 400 or 500 feet, and the Tracy tow was about 120 feet wide.

It was argued that the captain should have done one of several things other than to go ahead with all the power at his command. I think he decided on the best plan, but, whether he did or not, his decision was the result of a fair exercise of judgment under very difficult circumstances. The contrary view as testified by Capt. Nott called as an expert is but the old story of being able to tell, after the event, what should have been done, where the critics were not there, and were not confronted with the problem nor the emergency. There is always a Capt. Nott. Sometimes he sits by the cozy fireside, and sometimes he testifies in a courtroom. He recites how it could have been better managed, but, if the responsibility had been his, he would have been worried sick, and probably would not have done half as well.

So with the position of the helper tug; there was substantial testimony from expect tugmasters that Brown's disposition of the Walter Tracy was right; but, in any event, the record fails to support a conclusion that it was wrong to the point of negligence. Having held up toward the New Jersey shore, as indicated supra, Brown straightened up his tug about east to clear the reefs on that shore. As soon as he was almost clear of the reefs, he headed for Donovan's dock on Staten Island. Having taken that course, he then pulled—

"from around Jersey toward the ferry slip on the Bayonne side—Bergen Point Ferry. I had to change back across the Kills. * * * I made that reach pretty good until my tow started to sag for the Bayonne shore again, where you have to pull up for the National Dry Dock. I was all right till I got there. Your have to pull like the devil for the National Dry Dock, to keep your tow from going into the ferry slip and the reefs. The tide has another setback to Bayonne."

As Brown came to the National Dry Dock, he had in mind that the ships "were sticking out." He had noticed them when he was passing up and down the channel on previous occasions. He testified that he did not see any lights, although he was looking for them, and that he thought the vessels "were sticking out about 115 or 120 feet." By this he meant that the Arkansas was about the distance mentioned, and the Finsen about 15 feet not so far out. There were two other vessels, lying alongside the bulkhead at the pier. The location of the Finsen and the Arkansas and the presence or absence of lights become questions of much importance.

There is much contention as to how far out they were, and whether they were an obstruction to navigation. There was the usual conflict in estimates of distances, but I think the testimony of the surveyor, Thomson, in conjunction with the varying testimony of other witnesses, may safely be relied on as a guide. Thomson's plan shows that the Arkansas, after the collision, extended 75 feet beyond the bulkhead line, and 82 feet beyond the bulkhead itself, into the Kills, at a point where

the witnesses testified the navigable part of the channel for the tow in question was about 500 or 600 feet wide.

It is a fair deduction from all the testimony that the Arkansas was driven ahead at least 25 feet, but the testimony of one of the witnesses, who said that the gangway ladder which leads to the Arkansas, and which was about 35 or 40 feet long, was pulled around by the Arkansas moving ahead, so that the foot of the ladder, in addition to being pulled in to the side of the vessel, was moved up the dock about 10 or 12 feet after the collision, shows that the Arkansas moved ahead 25 feet. These figures would indicate that the Arkansas extended at least 107 feet beyond the end of the pier and into the navigable channel before the collision.

It was suggested upon the argument that the Finsen did not extend beyond the bulkhead line. This cannot be the fact, because, if that were true, the Powerful, which was the starboard barge in the second tier, and which collided with the Finsen, could never have done so, unless the forward barge were up against the Arkansas, and the other barges tailing into the slip. The barges being ordinary coal boxes about 100 feet long, or a little more, it would seem to be a physical impossibility for the Powerful to collide with the Finsen under the circumstances, without producing the conditions above named, and those conditions did not exist. There is little doubt but that the Arkansas's, stern extended somewhat beyond that of the Finsen, but probably not to any great extent.

Further evidence that the Finsen was sticking out beyond the bulkhead and into the navigable channel is found in the deposition of Capt. Nelson, master of that steamship. He testified that the Finsen was out "in the river," and that it was not a good place to lie. With this situation as to the Finsen, the rest of the story preceding and up to the time of the collision can best be told in Brown's words. He testified that as he came down to the steamers—

"I kept my wheel hard astarboard and called down to the engineer, on account of the weather conditions, to be on the alert. I had already rung for full speed ahead, and I was that way for 20 minutes to half an hour. I said to him to be on the alert; that it was a wild night out, and to keep her going for all she was worth; and I told the helper tug to do the same, to be on the alert, to be where he could be handy to go out and help, if necessary, and I headed my tug for Jersey all the time. * * * I was looking outside of my port window, and the steward had some fish he wanted to keep in good cool weather, and he put it in a cooking pot with a galvanized cover, and this whole thing came smashing by when I put my head out of the window. If it had hit me, it would have put me out of the way altogether. * * * When I pulled up for the National Dry Dock to clear the ferry slip at Bergen Point, and just as soon as I saw I had got my tow clear, I headed right around astarboard for Jersey again; but when my tow was far enough to be clear of Bergen Point ferry I got my tow pretty well in the middle of the channel, and when I tried to pull back for Jersey, instead of getting way enough from my tow, the wind and tide got the better of us, and drove us over to the Staten Island shore, and I had almost made a complete round turn to get away from there, and I saw no way possible for me to get out of there, and both tugs I had under extra full speed ahead. * * * The head tier of my tow got clear; the first four barges got clear, and it seemed as if there was something sticking out that struck the starboard boat in the second tier and knocked her adrift off my tow, and that carried the boats all off behind. It carried these four boats off my tow. * * * "

He concluded by stating that, if the two boats had not been sticking out, he would have succeeded in getting his tow clear.

[2] There is no doubt that the wind was very severe, and the wind and the tide conditions rendered Brown's task most difficult; but the case is not one of inevitable accident. The testimony as to a competent lookout, properly stationed, with sole duties as a lookout, is unsatisfactory. The deck hand was on watch on deck; he was "handy to carry out any orders, to carry any message to any part of the boat; he was up in the bow where he was handy." But he should have been stationed as a lookout solely. The Wilbert L. Smith (D. C.) 217 Fed. 981; The Tillicum (D. C.) 217 Fed. 976; 11 C. J. 1120, § 176. This is important in connection with Brown's answer in the affirmative to the question:

"If you had known, either by lights on the steamers or for any other reason, that those steamers were there, if you had known soon enough, you could have gotten out of the way and avoided them?"

If, then, there was a light, Brown was guilty of a fault. He could not be expected to discern at night the exact position of the Finsen and the Arkansas, merely because he had seen them in the daytime; but, knowing they were there, he was bound to be alert in his outlook for a light.

Before considering that lights, if any, were displayed, it may be observed that the Finsen and the Arkansas were obstructing the fairway on the night in question. It may very well be that in broad daylight a moored vessel may not be regarded as an obstruction, and as contributory to a collision, while that very same vessel at night may constitute a menace to navigation, and particularly so when weather conditions are such as to make navigation of moving craft highly difficult. In these waters, where tugs are constantly moving with large tows, and carrying coal or other freight vital to the welfare of the community to points of destination, the practice, if such there be, of allowing vessels to project into the channel, should be condemned. Such projections tend to embarrass navigation, and, lights or no lights, lead to collisions on wild nights like that in question.

The testimony of Connery was quite convincing. He was an intelligent and, as I thought, truthful witness. His testimony establishes satisfactorily the fact that there was a light on the poop deck of the Arkansas; that it was a bright light, and was burning at the time of the collision, and was flush with the stern of the Finsen, and illuminated the stern of the Finsen. Had Brown seen it in time, he might have avoided the collision. I do not doubt his testimony that he did not see it, and this I attribute to the concentration which his task imposed on him.

It is a common experience that, when one's attention is centered in one respect, visible objects may escape notice. As to the other lights, the evidence fails to leave any certainty that they were burning at or shortly before the time of the collision. Just how far this light described by Connery could have been seen by Brown is, of course, uncertain; but his own testimony is to the effect, in substance, that if he had seen a light he could have avoided the collision.

Yet my view is that, in the difficulties which confronted Brown, he was entitled to the full benefit of the channel, and, had this been so, the collision would not have occurred. I conclude, therefore, that both the Mary Tracy and the Finsen were at fault. I do hope, however, that this will not embarrass Brown in his career as a master.

I am unable to see, however, how fault can be charged against the Arkansas, with which the Tracy tow did not collide. The case might have been different, had the Tracy tow cleared the Finsen and found the Arkansas in the way. The Arkansas is, therefore, absolved.

[3] In respect of the Walter Tracy, the question of exemption is interesting. She was to all intents and purposes mentally inanimate. She was a separate tug, as much so as if owned by a separate owner. She performed her task under the orders and direction of the master of the Mary Tracy. Her own master had no power nor discretion. In such circumstances, I am of opinion that she is exempt.

[4] As it is apparent that there was no privity, the Mary Tracy may properly avail of limitation. The form of the decree, including the award of costs around the circle, may be submitted on five days' notice.