FRISTAD v. THE PREMIER.

SPENCER v. THE FRISTAD.

(*District Court, D. Washington, N. D.* August 15, 1892.)

COLLISION—VESSEL AT ANCHOR—MUTUAL FAULT.
  A bark was anchored on a dark night in the "Ballast Grounds" of the harbor of Port Townsend, in a course usually traveled by vessels entering the same, although not within legally reserved fairway. A lantern suspended from her rigging, which failed to give a steady light, was the only warning of her presence. A steamer entering the harbor at full speed collided with the bark, whose presence was not perceived by the steamer's lookout, although the bark was in the direct line of the electric lights in Port Townsend. *Held,* that both vessels were in fault,—the bark in not furnishing proper warning of her presence; the steamer either in the inattention of her lookout, or in entering the harbor at full speed,—and it was therefore a proper case for division of damages.

In Admiralty. Cross libels to recover damages caused by a collision. Decreed that both vessels were in fault, and that the damages be divided.

*Thompson, Edsen & Humphries,* for the Fristad.

*Hughes, Hastings & Stedman,* for the Premier.

HANFORD, District Judge. The master of the Norwegian bark Fristad, in behalf of her owners, has brought this suit *in rem* against the American steamer Premier to recover damages for injuries sustained by the bark in a collision of the two vessels; and the owner of the steamer has filed a cross libel, claiming damages for injuries to her, caused by the same collision. The time of the collision was 3 o'clock A. M., February 1, 1892, and the place was the entrance to Port Townsend harbor, nearly midway between Marrowstone Point and Point Hudson. The bark was at anchor there, and, by force of a flood tide and the wind, was held with her stern towards Marrowstone Point. The steamer in making the run from Seattle to her usual landing place at Port Townsend, while on her usual course from Marrowstone Point and running at full speed, about 13 miles per hour, ran against the bark endwise, the stem of the steamer striking the stern of the bark between her center and the corner on the starboard side. The bark was not seen by the officers or the lookout of the steamer until the vessels were too near to each other to avoid the collision. The bark had a lantern hung from her starboard forerigging about 17 or 18 feet above her hull. Whether it did or did not give forth a light visible to the officers of the steamer as she approached, is one of the controverted points of the case. The master and officers of the bark were on board of her and asleep. Members of the crew were assigned to keep watch, one at a time, each man to be on duty one hour. The two whose respective watches were from 2 until 3 and from 3 until 4 o'clock have testified that they did not see or hear the steamer, and were not aware of her approach before she actually struck, and no sound or warning to passing vessels was given, other than the lantern hung in the rigging as aforesaid. The night was dark, but

clear, and Port Townsend was brilliant with electric and other lights, the rays of which emanated from various points of elevation up to the eminences of the residence district, and down to Point Hudson beach. As the Premier rounded Marrowstone Point, and straightened on her course, heading for Point Hudson, she had the Fristad between her and the lights of the city, and laying directly in her course; so that the light of the latter, even if burning brightly and not obscured by the rigging, could not have been distinguished from other lights by persons on the steamer, except for a very short distance. The master, pilot, and a quartermaster of the Premier were on duty in her pilot house, and she had a lookout on deck. As soon as possible after discovering the Fristad, the master of the Premier gave his commands to put her helm hard astarboard, and go astern full speed, which orders were instantly obeyed by the quartermaster and engineer, but without effect, to avoid the collision or moderate the force of it.

In behalf of the Premier it is earnestly contended that the facts of this case, as I have narrated them, clear her of all responsibility for the accident. I am of the opinion, however, that, even if there was no visible light on the Fristad, she could have been seen from the Premier in ample time, if the attention of her officers and lookout had not been diverted during the two or three minutes preceding the collision. If they were not guilty of a lack of vigilance, I must regard the fact that the collision occurred as proving that it is dangerous for a steamer to enter a harbor at full speed on a dark night. Therefore I must find that the collision was in part, at least, due to either inattention to their duties, or a positive infraction of the rules of navigation on the part of the Premier's officers and crew.

The lantern in use on the Fristad has been brought into court, and made an exhibit in the case. The globe and frame of it are of the best material, and the proper size. I find no fault with it, except that the burner is not reliable. In experimenting with it, a sudden jarring of the stand on which it was placed, caused only smoke instead of flame to issue. Two or three repetitions of a similar jarring caused it to burn again, and give a strong light. From the testimony it appears to me to be quite probable that during part of the night before the collision this burner was smoking instead of giving light. The officers and lookout of the Premier have all testified that, when the bark came into view, they saw no light upon her. Other steamers passed the Fristad on the night of the collision, and persons who were on board of them, including their pilots, have testified that they saw the Fristad when passing, and saw her light after passing her, but did not see it before. The master and mate of the Fristad have shown by their testimony that after the collision the light was taken down by the master's orders to be fixed, because it was not so bright as when they first noticed it after the collision. The mate, upon examining it, found, as he supposed, that the wick had dropped down, and screwed it up to improve the light. After considering and weighing the evidence upon the point, I find that there

is a fair preponderance, of it to sustain my conclusion that this lantern did not, on the night of the collision, give a uniform or steady light.

The place at which the Fristad anchored is within the limits of what is known at Port Townsend as the "Ballast Grounds," the water being so deep that vessels can there dump ballast overboard without violating any law or harbor regulation, and it was for the purpose of discharging ballast that the Fristad was anchored at that place. Although directly in the usually traveled pathway of vessels entering the harbor from the southward, said place is not within a legally reserved or recognized fairway, and any vessel may lawfully lay at anchor there. It is, however, a place of danger at night, because of the large number of steamers frequenting said pathway, and the difficulty of distinguishing an anchor light from other lights. A due regard for safety and good seamanship requires that on board a vessel in such a situation a vigilant watch be kept, and that in some manner, as by ringing a bell, approaching vessels should be warned, rather than depend entirely upon a single lantern. No such warning was given, and the testimony of the two watchmen, that they did not see or hear the Premier before the collision, convicts them of inattention and neglect of duty. In my opinion, the Fristad must be regarded as being in part responsible for the casualty, and the case is a proper one for a division of damages.