**EASTERN TRANSP. CO. v. UNITED STATES.**

**DUKE et al. v. SAME. BOSTON & M. R. CO. v. SAME.**

**THE SNUG HARBOR.**

District Court, E. D. Virginia. December 8, 1928.

Supplemental Opinion December 19, 1928.

Baird, White & Lanning, of Norfolk, Va., and Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, for libelants.

H. H. Rumble, Sp. Asst. Atty. Gen., and J. Frank Staley, of Washington, D. C., for respondent.

GRONER, District Judge. This suit was begun July 26, 1921. It was first brought to my attention on September 30, 1922, on a motion to dismiss for want of jurisdiction. This motion I denied. 283 F. 1015. On January 30, 1925, by agreement of counsel, the question was reopened, and, on the admission that the wreck was a total loss and that no suit in rem would lie, and on the strength of Blamberg Bros. v. United States, 260 U. S. 452, 43 S. Ct. 179, 67 L. Ed. 346, and James Shewan & Sons, Inc., v. United States, 266 U. S. 108, 45 S. Ct. 45, 69 L. Ed. 192, I reached the conclusion the court was without jurisdiction, dismissed the libel, and, at the instance of libelant, certified the question of jurisdiction to the Supreme Court under section 238 of the Judicial Code (as it was before it was amended by the Act of February 13, 1925). See 38 Stat. 804. The Supreme Court, on January 3, 1927, reversed and remanded for further proceed-

ings. 272 U. S. 675, 47 S. Ct. 289, 71 L. Ed. 472. In reversing, the Supreme Court held that the Suits in Admiralty Act (Act March 9, 1920, §§ 3 and 6 [46 USCA §§ 742, 746]) was intended to give an action against the United States in cases where the *owner* of the vessel would be personally liable as well as in cases where only the *vessel* would be liable. The concluding part of the opinion of the Chief Justice is as follows:

"The cause of action grows out of the responsibility of the government for a merchant vessel which in the course of its employment had become a danger to navigation and which imposed a duty to avoid that danger. A wreck which is a total loss will not furnish basis for an action in rem, as we have assumed; but, if a proceeding in admiralty permitted by the act embraces the principles both of suits in personam and suits in rem, it is a most natural construction of the act dealing with merchant vessels employed by the United States to include, as a suit in personam permits, one for a tort caused by the negligence of the United States in dealing with a wreck of its merchant vessel and its failure to comply with its own navigation laws therewith."

The case has since been submitted on the merits. The uncontroverted facts are that the steamship Snug Harbor, owned and used by the United States solely as a merchant vessel, while on a voyage from Baltimore, Md., to Portland, Me., came into collision August 15, 1920, with the barge Pottsville in tow of the tug Covington, and sank at a point about 4½ miles east by north of Montauk Point Light, and became a total loss. On the 14th of September, following, the barge Winstead, loaded with coal and in tow of a tug, on a voyage from Norfolk, Va., to Fall River, Mass., without fault of those in charge of the tug or tow, came into contact with the wreck, and, as a result, was sunk, and with its cargo became a total loss. The ground upon which the libel is filed is that, by reason of the failure to buoy or light the wreck, or to destroy the same, the United States, as owners of the Snug Harbor, are liable for the loss of the barge. The Supreme Court having decided that the United States, in the operation of a merchant vessel, are liable to the same extent that a private owner would be, and, in like circumstances, are liable for the failure to observe the terms of the Act of March 3, 1899, known as the "Wreck Act," it follows necessarily that the determination of responsibility for the loss turns wholly upon whether the evidence sufficiently shows the acts of negligence charged.

It is not denied that libelant's barge was lost by coming into contact with the wreck of a steamer belonging to respondents. It likewise is not denied that the wreck was not buoyed or lighted. The collision occurred in less than 30 days after the sinking of the steamer; the original collision at 9:30 p. m. August 15, and this collision at 5:30 p. m. September 14. Nor is it contended that the collision was due to any fault on the part of those in charge of the barge, and I think it may fairly be stated that the evidence shows there was no affirmative act of abandonment. This leaves for consideration only three questions: First, was the place where the Snug Harbor was wrecked a navigable channel within the terms of the Wreck Act (Act March 3, 1899)? Second, may abandonment be presumed from the circumstances shown in evidence? And, third, was the lack of knowledge of the place where the wreck occurred, under the circumstances, sufficient to justify the failure to locate it and consequently to mark and buoy it? I shall discuss these questions in the order in which I have stated them.

There was no affirmative act of abandonment; that is to say, no notice of abandonment was given the Secretary of War. The collision occurred in a fog. The crew of the sunken vessel was saved, and the master, in apt time, made his report. In this he stated that the collision occurred one-half mile west, three-quarters south from Montauk Point gas buoy. This point is in the ocean at the entrance to Block Island Sound. Whether he was mistaken as to the point of collision, or whether the Snug Harbor, after receiving the wound which resulted in her sinking, drifted six miles to the point where she finally rested on the bottom, is not wholly clear, though I think the evidence, when considered in connection with the character of the injury and the fact that the Snug Harbor was an iron vessel fully loaded with coal, is strongly against the probability that the master was correct in thus locating the point at which the collision occurred. It is much more likely, I think, that the collision actually occurred within considerably less than a mile of the place where the vessel sank. The manner in which she sank, however, left nothing above water to mark the spot. She went over on her side, and neither her masts, her funnel, nor any part of her superstructure was visible above the surface. Whether, in these circumstances, the owner, believing the wreck was sunk in the ocean, and not in a navigable channel, was relieved of the duty of taking any action with respect

thereto, is a question which I reserve for discussion under the last of these headings.

The question now to be determined is: Was the place at which the sunken vessel lay such a place as within the provisions of the wreck statute required the marking of the obstruction? The language of the act (section 15) is: "It shall not be lawful to * * * sink, or permit or cause to be sunk, vessels or other craft in navigable channels." Section 19 provides that whenever the navigation of any "river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed * * * by any sunken vessel" (33 USCA § 409), it shall be the duty of the Secretary of War to remove the obstruction whenever it shall have existed for 30 days or shall have been sooner abandoned.

Here the wreck of the Snug Harbor lay on the bottom of Block Island Sound, in approximately 40 feet of water, about 4 miles to the eastward of Montauk Point Light and 9 miles westward from the southernmost part of Block Island. This wide roadstead is navigable for nearly its entire distance from shore to shore for vessels of the largest size.

As generally understood, a channel is a depression, either natural or artificial, below the permanent banks over which the waters flow; but, as used in connection with navigation, it is generally understood to mean the line of deep water which vessels follow in navigating from place to place. As used in paragraph 15 of the statute, it must be considered in connection with the language in paragraph 19, which extends its terms to any "river, lake, harbor, sound, bay, canal, or other navigable waters of the United States" (33 USCA § 414), and, if this be true, the act would apply to the open waters of Block Island Sound, and this, I think, is the correct construction to be placed upon its language. I am not advised of any case in which the precise question has arisen, but I think the conclusion consonant with the purpose Congress had in view in enacting the statute. Judge Hughes, in this court, in the case of The Oliver, 22 F. 849, defined the term "channel" as referring sometimes to the current of a running stream, but said: "In tidewaters the term refers to the movement of vessels, and means that part of the water on which vessels move." That the point at which the Snug Harbor sank was in this sense a frequented channelway is abundantly shown in the evidence, for it is uncontradicted that the great majority of north and southbound coastwise vessels going to and returning from Rhode Island and Massa-

chusetts ports steer a course to take them over or close to the point of the wreck; and this conclusion is fortified by the fact that in the interval between the wreck of the steamer and the loss of the barge, on at least two different occasions, other vessels fouled the obstruction. I think, therefore, I must answer the question "Yes."

█ This brings me, then, to consider whether, under the circumstances I have named, that is to say, the knowledge of the sinking plus the uncertainty of location, required, on the part of the owner, a formal act of abandonment by notification to the Secretary of War that the United States no longer claimed any property or rights in the vessel in order to avoid the performance of the duties imposed by law. The statute (section 15) makes it the positive duty of the owner to mark a wreck until it is removed or abandoned, and section 19 provides that, where the channelway has been obstructed for a longer period than 30 days without legal abandonment, the wreck shall be subject to be broken up or removed by the Secretary of War. Of course, the statute should not be construed to impose an impossible condition. If in the exercise of due diligence, having regard to all the existing circumstances, the wreck cannot be found, the penalties and responsibilities which it imposes should be and doubtless are noneffective.

But the contrary is equally true; that is to say, if in the exercise of due diligence the wreck may be found, the positive duty enjoined by the statute becomes at once effective, at least until after the expiration of 30 days, and therefore no presumption of abandonment arises out of indifference or inaction. It was so held in People's Coal Co. v. Second Pool Coal Co. (D. C.) 181 F. 609; Second Pool Coal Co. v. People's Coal Co. (C. C. A.) 188 F. 892. In that case, the wreck had existed from March 15th to April 5th, during which time no effort had been made by the owner either to mark it or to reclaim it, and this, it was urged, constituted abandonment; but it was held that to hold this would permit the respondent to take advantage of his own wrong and that the neglect to mark a sunken craft, or to remove it, is not prima facie abandonment until a period of 30 days has elapsed, or the Secretary of War has formally taken control.

█ But it is insisted on behalf of respondent that on August 19th the Lighthouse Department undertook the duty of searching for and finding and marking the wreck; that, in so doing, this department of the government acted in the discharge of a public func-

tion; and that, from the time it undertook the work, respondents were relieved of any further obligation to the same extent as though formal abandonment by notice to the Secretary of War had occurred. The Utopia (1893) App. Cas. 502; The Plymouth (C. C. A.) 225 F. 483; The R. J. Moran (C. C. A.) 299 F. 500, 1924 A. M. C. 796; The City of Taunton (D. C.) 11 F.(2d) 285, 1927 A. M. C. 135; The Oregon Horaisan Maru (D. C.) 27 F.(2d) 185, 1928 A. M. C. 794—are cited in support of this principle. I have examined these cases carefully, and I do not think they go the extent claimed. They do hold that, when the wreck is found, and the Lighthouse Service, either voluntarily or at the request of the owner, buoys and lights the wreck, the owner may not thereafter be held for damage caused by the faulty way in which the work is done. This is so because, when they act with respect to marking a wreck, they act officially, and because the owner, though he may believe a better and safer way should be adopted, is not authorized for that reason to challenge or change what they have done. But there is no obligation on the Service to find a wreck. On the contrary, this duty is imposed on the owner, and though the Service may extend its facilities to the owner to aid in finding the wreck in the interest of safe navigation, such action on its part does not pre-empt the field or excuse the owner from the personal performance of a duty imposed by law. I am constrained to hold, therefore, that, notwithstanding the efforts of the Lighthouse Service to find the wreck, the continuing obligation of the owner, either formally to abandon or to use due diligence to find, continued unabated.

█ This leaves only the inquiry whether due diligence was in fact exercised to find the wreck. The position of the respondent in this respect is that the Lighthouse Service on August 19th began to make inquiries as to the location of the wreck, and that this service continued from time to time until it was found and marked, after the collision with the Winstead, and that in the effort to find and mark the wreck, everything was done that in the circumstances was necessary or proper. In this case, the respondents are the United States. The sunken vessel belonged to them. The Lighthouse Department is a governmental agency, and it would seem to me necessarily to follow that the United States, as owner of the Snug Harbor, in their duty to find and mark the wreck, might impose this responsibility upon any agency they selected for the purpose. Notwithstand-

ing, therefore, the fact that the Shipping Board, under whose control the vessel was, apparently failed to do anything to find and mark the wreck, if what it should have done was done by some other department of the government, the United States are entitled to set up this activity in complete discharge of their statutory obligation.

■ The question, therefore, is: Was 'the work done by the Lighthouse Service of that nature and character that fulfilled the responsibility placed by statute on the owner of a sunken craft? Much testimony has been taken, and—condensed—it shows that upon the receipt of the master's report of the sinking, inquiry was made from time to time of lobster fishermen, habitually using Block Island Sound, in an effort to ascertain if any had information of the location of the wreck. On August 28th, an order was issued to the lighthouse tender Tulip directing her to search for the wreck and buoy it if found, and on September 1st and 2d the Tulip, while on a voyage between New England ports, cruised the waters in and around Montauk Point for seven hours in an effort to find the wreck. If any part of it had been visible above water, the search doubtless would have resulted successfully; but, since it was wholly submerged, the attempt was almost necessarily abortive. Doubtless those in charge of the Tulip, while carefully performing the order to locate the wreck, would have adopted other and more certain means of accomplishing the result sought, if the vessel and her crew had been exclusively allocated to this special job. But this was not the case; the search was directed to be performed while on a regular trip on other business. The officers charged with the duty of searching had nothing more than general information of the sinking to guide them in finding the obstruction. They had not communicated with the officers of the Snug Harbor, or with the officers of the barge with which she collided, nor had the latter apparently communicated with them. No effective effort was made by the Service to obtain specific and definite information from any source, doubtless because it was realized that the duty of finding the wreck was primarily some one else's.

Two other vessels were in collision with the wreck some three weeks later, one on the 23d of August, and another on the 25th, and reports were made, at least 4 days prior to the sinking of the Winstead, to the local inspectors and to the Lighthouse Service of these collisions. These reports were in themselves notice that the wreck was a danger to

shipping and imposed the duty of further search. The first step in the discharge of this duty demanded prompt inquiry of the officers of these vessels to ascertain what information they had, and quick action on the information then at hand. If the well-recognized method of ascertaining the location of a submerged wreck had been adopted, the ensuing loss and damage might have been avoided. When the opportunity was allowed to pass unnoticed, the responsibility for the failure may not be avoided by suggesting the probability of its lack of success. Upon the assumption, therefore, that the United States is entitled to credit for the things done by the Lighthouse Service, a fair weighing of it all does not meet the plain requirements of the statute, for, while it may not be asserted with certainty that during the interval between the receipt of the report of damage to other vessels and the sinking of the Winstead, the wreck would have been found, it may not be asserted with any greater assurance that it would not.

■ The question is not so much whether the effort to find the wreck would have been successful as whether the duty which the statute imposes to do all reasonable things to that end was obeyed. The area to be searched, because of the uncertainty of the point of the sinking of the Snug Harbor, was extensive; but this fact does not make the statute any less effective, though it may reasonably be contended it enlarged the time before its penalties became operative. If, in this case, the wreck of the Snug Harbor had rested on an even keel, so that some part of her superstructure extended above the surface of the water, the duty to mark and buoy the place would have arisen at once, and a day's delay, resulting in damage to another vessel, would have created liability. That none of her superstructure was visible, and that the collision itself occurred in a fog, making the place of her sinking uncertain, increased, perhaps, the time within which the duty imposed by the statute might be fully discharged; but it did no more. The enlargement continued only for such reasonable time as in the exercise of vigilance and care the obstacles encountered might be overcome, and the excuse for failure ought only to be accepted on a showing that this vigilance and care was exercised and was unavailing.

In this case, it is not shown that this was true, and, in consequence, the respondents must bear the loss.

### Memorandum by the Court.

At the bottom of page 12 of the opinion filed by me in this case on the 8th of this month [29 F.(2d) 592], I stated: "Two other vessels were in collision with the wreck some three weeks later, one on the 23d of August, and another on the 25th, and reports were made, at least four days prior to the sinking of the Winstead, to the local inspectors and to the Lighthouse Service of these collisions."

Now, at the request of counsel for the respondent, and that there may be no controversy on the appeal in this case, I certify that the reports referred to by me show as to the barge Stetson that the obstruction was encountered "off Montauk Point," and as to the barge Fall River that the obstruction was encountered "six miles east one-fourth south from Montauk Point lighthouse."

In making this certificate, I wish to observe that I was not unmindful of the character of the reports referred to in reaching my conclusion. After the reports were received, no effort was made to locate the obstruction reported. It was this failure of effort, rather than the question of whether the information itself was sufficiently definite to immediately locate the wreck, that impelled the conclusion reached by me that there had been a failure by the respondent of its duty in this regard.