### GRAUDS v. THE AMERICAN TRADER et al.

### AMERICAN TRADING & PRODUCTION CORPORATION v. THE EVERALDA et al.

Nos. A–16488, A–16490.

United States District Court
E. D. New York.

Jan. 20, 1950.

Paul A. Beck, New York City, proctor for Steamship Everalda and Fricis Grauds.

Burlingham, Veeder, Clark & Hupper, New York City (Adrian J. O'Kane, New York City, of counsel), proctors for Steamship American Trader and American Trading and Production Corporation.

BYERS, District Judge.

These causes, which apparently have enjoyed undisturbed repose in the files of this court since the filing of the libels in March of 1942, came to trial some seven years and eight months later, at a time when the memories of the three witnesses who testified in person may be scarcely deemed to have been whetted by the lapse of time.

Decision is required concerning the striking of the Latvian Steamship Everalda while she lay at anchor in the anchorage at Stapleton, Staten Island, off Pier 15, on March 12, 1942, at 4:08 A.M., E. S. T., by the Tanker American Trader, as the latter was bound to sea; she had left her own anchorage off Pier 6, Tompkinsville, at 3:55 and traversed about 4200 feet on a S.S.E. course before the striking, as she made her way through a group of perhaps 20 ships, all riding at anchor in these waters.

Both vessels sustained damage, and the respective libels are appropriately cast to allege mutual charges of fault.

As the result of concessions made at the trial, and of the absence of conflict in much of the testimony, the real issue comes down to the question of whether the Everalda was showing anchor lights at the time the American Trader picked her up, and until the collision. As to that, Findings will be made to facilitate review, but in the main a recital will suffice to depict the situation.

The respective vessels were Steamships of these characteristics:

American Trader (built 1923): Single screw tanker, 498.2 feet water-line length, by 66 feet in beam, 36.8 feet moulded depth, 8,862 gross, 5,535 net, tonnage.

Everalda (built 1912): Well deck cargo ship, 350 feet (between perpendiculars) by 50 feet in beam, 27.9 feet moulded depth, 3,950 gross, 2,452 net, tonnage.

On this occasion the former was light, while the latter was loaded to about one-third capacity.

The striking occurred while it was yet dark; the night was clear, and visibility good, i. e., a lighted vessel could be seen for not less than a mile. The tide was flood, which means that the Everalda tailed to the north as she swung to her bow anchor which was paid out to 45 fathoms.

The wind was out of the west at not to exceed an hourly force of 11 miles, i. e., it was about abeam of both ships, and is not argued to have been of effect.

The Trader hove up her anchor and got under way when her engines were put in slow ahead. She was navigated by Sandy Hook Pilot Madigan, a full branch Pilot of 20 years standing in 1942. He was on the bridge with the ship's Master, Hess, with a quartermaster at the wheel, the second officer, and a Coast Guard seaman.

On the forecastle head were the Chief Officer (not called as a witness), Budris ('O. S.), and another sailor, an A.B., not otherwise identified. Budris acted as lookout, and as his ship approached a dark object in the water that proved to be the Everalda, he reported her to the bridge as either a ship or an object dead ahead, and was answered by an acknowledging call from the bridge. This established the fact and functioning of the lookout.

The Pilot says he at once looked ahead and could see nothing, but ordered the engines to stop, then full astern. In this, the engine-room bell book bears him out, for it shows: Slow, Stop, Full astern, and a jingle, all within the minute 4:08. As to these orders from the bridge and their execution, the deposition of Bigelow, the second officer on the bridge, taken within three months of the collision, is in accord with the Pilot's testimony at the trial.

When the ships were separated by from 200 to 300 feet, the loom of the stern of the Everalda was made out on the bridge of the Trader, as were her masts. The Master, Hess (deposition taken May 13, 1942) estimated that about one-half minute elapsed between the report of the lookout, and the order putting the engines full-speed astern. That is a convincing statement, since both the Pilot and the Master were on the alert. The Trader struck the Everalda a glancing blow, i. e., the "third plate on the starboard bow (Trader's) right above the hawse pipe" struck the port quarter of the other ship.

The blow caused a 21-inch crack in the Trader's plate having a 5-inch opening at its widest part, so that the impact was more than casual. Then the Trader sheered off, and proceeded alongside to port of the Everalda, under a left rudder, and continued on her way, after unsuccessfully hailing the other ship to learn her name.

It is agreed that the Trader was proceeding at a speed of between 3 and 4 knots just prior to putting the engines full astern.

As stated, the critical issue is whether the Everalda was showing anchor lights. The testimony for all Trader witnesses is that she was not. That is consistent with her Master's statement that he "contacted" the Harbor Patrol "right below the Narrows to investigate", i. e., "We told them we had a collision with a ship off Pier 17, and the ship was in blackout, and investigate who it was".

Since no definite meaning has yet been ascribed to the slovenly infinitive "to contact" which has made its dubious way into usage in certain circles, it is impossible to know what medium was employed by the Master to impart the important information so referred to in his deposition. The subject is mentioned merely to indicate that, if indeed he spoke to any officer in command of a Harbor Patrol vessel as he says, and in such a way as to elicit acknowledgment, that incident would tend to corroborate his belief based upon observation, that the Everalda in fact showed no anchor lights.

Testimony from Coast Guard sources, as to this alleged incident, has proved to be unavailable.

For the Everalda, the only witness who was in a position to testify on the subject was one Harned, a watchman on the ship, employed by "McRoberts, a ship watching agency". He had come aboard at 7 o'clock

on the evening before, at which time he said he observed that two anchor lights were rigged and burning: the aft light was hung by a rope to the flagstaff at the stern, and the forward light was "on the stays (not otherwise identified) * * * about 300 feet forward of the stern light". See deposition of Sedlins, 2nd officer, taken March 20, 1942, page 49, where the following occurs:

"Q Could you see that light after you were on the after deck? A No."

He it was who hung the kerosene burning lamps in the rigging; his testimony will be the subject of later reference.

The visibility of the forward light from the after deck, as stated above, is relevant to the testimony of Harned as to what he says he observed. The material part is that he had made a round of the ship five or ten minutes before the collision and he observed that both anchor lights were burning. He had taken the aft lantern (Grauds Ex. 2) to the office of the proctor for the Everalda a day or two after the collision, so the importance of the subject of the ship's lights was even then present in his mind. It is assumed that it has so continued in spite of the intervening years.

His demeanor as a witness was more favorable than might appear from reading his testimony, for while he was not precise in certain respects, I think he meant to tell the truth as best he could recall the incidents of his performance of a watchman's job, particularly as he didn't like the ship or the second mate, "and I wasn't going to let him have anything to complain about".

I accept his statement that during the night he looked at the lights and saw them burning, and that his anxiety to repeat that both lamps were said to be warm, though unlighted, after the collision, caused him to say that he had observed them as lately as five or ten minutes before. As to that interval of time, I think he is mistaken, and that it was longer.

The testimony of Sedlins, that the lights had been rigged by him, must be accepted, but I am not satisfied that the supply of kerosene was adequate for the entire period of darkness, since he tested that only by shaking the lamps.

Sedlins establishes clearly that both lamps were out when he reached the deck promptly after he sensed the bump of the collision or scraping.

It should be said in this connection that both the ship's Master and the first officer had remained ashore from about 7 o'clock on the night of the 11th until after the collision, and that Sedlins was the only ship's officer on board during the night, and he was asleep in his cabin from about 10 o'clock until he was awakened as stated. There was no anchor watch, and no one of the ship's company was on duty during the night, the care of the ship being left entirely to Harned. He of course followed no routine in walking about the ship, and at intervals rested and went into the galley for coffee, and as otherwise required. His prime duty was to see that no unauthorized person came aboard, and anything he says he observed was not even incidental to the discharge of that office.

When Sedlins went to the deck, he at once looked to the lanterns and found them both to be unlighted. He lowered each to the deck, and relighted them in turn, calling the attention of the chief engineer to the fact that they were warm. As to that (Deposition, page 62):

"Q It didn't burn your fingers? A No, it wasn't too hot."

The flagstaff supporting the stern light had been cracked and was partly broken, though still upright, being supported apparently by a wooden framework in the nature of an awning support; the crack is deemed to have resulted from the striking of the staff by the overhang of the Trader's bow, which conceivably could have caused the flame in the lantern to fail, although the lantern itself was not knocked down. However, as is argued for the Trader, there is no reason to think that the blow is likely to have produced the same result in the lantern hung in the stays 300 feet forward of the stern flagstaff. Yet that too was out and Sedlins also lowered and then relighted it.

Since neither lantern was too hot to be easily handled and relighted by Sedlins promptly upon his reaching the deck, the inference is plain that neither light was functioning between the time that the Trader broke ground, 3:55 A.M., E.S.T., and the time of impact, 4:08 A.M., E.S.T., which is consistent with the testimony of the Trader witnesses.

Upon this branch of the case, and in view of all the testimony on the subject, and after giving weight to such conflict as may be thought to exist, and in view of the lack of affirmative evidence for the Everalda covering the critical time, the following Findings are made:

1. The Everalda carried adequate and proper anchor lights to conform to the requirements of Art. 11 of the Inland Rules, 33 U.S.C.A. § 180, at 7 P.M., E.S.T., on March 11, 1942, and at that hour they were burning.

2. The said lights were not burning from about 3:55 A.M., E.S.T., until after the collision referred to in both libels, which occurred at about 4:08½ A.M., E.S.T., on March 12, 1942.

The faults attributed in the first libel to the Trader include her navigation at too great speed under the conditions shown. There is no supporting testimony, and the evidence is to the contrary. The same remark applies to the alleged failure of lookout, and failure to give proper heed to the anchor lights of the Everalda, as to which Findings have been made.

The remaining faults alleged are her failure to keep clear, which falls within the above, and that she did not stop and reverse her engines in time, and otherwise was carelessly navigated.

The only support for the latter assertion would lie in the failure of the Pilot to order a left rudder at the time the engines were stopped and then reversed. If that had been done, it is reasonable to infer that response by the ship would have been prompt enough to avoid the striking, which was a glancing blow. However, it is not more than a permissible inference, and is not thought to visit fault upon the Trader, in view of the Pilot's testimony of his first glimpse of the Everalda:

"The Court: What did you say that dark object was that you saw?

"The Witness: Your Honor, it could be anything.

"The Court: What did you think it was?

"The Witness: I thought possibly it might be the stern of a ship going down ahead of me when it was reported. Lots of times so many of those ships sail together, and many, many occasions they had four stern lights or none at all at that time."

. Until he could determine what the dark object was, and whether it was moving and, if so, in what direction, I fail to see how he could take the risk of changing his helm. His first duty was to stop, and that he tried to perform.

The Trader rests under the burden of proving that she was without fault, or that her striking of the Everalda was occasioned by the fault of the latter. See Carr et al. v. Hermosa Amusement Corporation, Ltd., et al., 9 Cir., 137 F.2d 983, at page 985, and cases therein cited.

It seems to me that she has met this burden, and is not to be condemned within the case of Fristad v. The Premier, D.C., 51 F. 766.

In the libel filed for the Trader, the specifications of fault are that the Everalda was not in charge of a competent person; that she did not keep any lookout; that she did not maintain an anchor watch; that she did not display anchor lights; that no one was stationed at the anchor windlass to maneuver by hauling in or paying out the chain; that she did nothing to avoid collision.

Much of the foregoing is covered by what has been written. It follows that she is at fault under the proof, at least as to the first four specifications. The fifth should be considered in connection with the absence of an anchor watch, which is to be discussed, and as to the sixth there is perhaps no inference of what she could have done under the circumstances, if properly tended. Cf. The Beaverton, D.C., 273

F. 539, and The Gulf of Mexico, 2 Cir., 281 F. 77, at page 81.

■ The failure of her anchor lights to function during the interval when they could either have prevented the collision at all, or have cast the burden on the Trader, spells out a breach of the Inland Rules, and thereby places her at fault in the absence of such exculpatory evidence as is required according to The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. There has been no attempt to supply such evidence here, nor could there have been, in view of the casual nature of the custody of this vessel during the night in question.

The first two faults have been shown, for the Everalda was not in charge of a competent person, for the watchman obviously did not meet that requirement, nor was any lookout maintained.

As to the lack of anchor watch, namely, " * * * the lookout entrusted to one or two men when the vessel is at anchor" (O'Hara et al. v. Luckenbach Steamship Co., 269 U.S. 364, at page 371, 46 S.Ct. 157, at page 160, 70 L.Ed. 313), the specification was not automatically established.

The Everalda did not lie in the channel, but at anchorage grounds, and therefore is not to be judged by what was said in The Richmond, 2 Cir., 63 F. 1020, at page 1022: "It is the duty of a vessel brought up in a frequented channel to maintain a vigilant anchor watch, ready to give her chain or sheer her clear of an approaching vessel. The Richmond was anchored at a place presumably inconvenient or embarrassing to the navigation of other vessels."

However, the testimony here tends to show that during March of 1942 these waters described on the chart (Grauds Ex. 1) as "Temporary General Anchorage" did not constitute a sanctuary from the traffic of moving navigation. There were so many ships at anchor there on the evening of March 11th that the Pilot found difficulty in locating a safe place for mooring. The arrival and departure of merchant shipping in this harbor was in such volume as to constitute a condition with knowledge of which all shipping interests were chargeable.

The very proximity of a considerable number of other vessels, and the necessary incidents of that state of affairs, should have taught the Master of the Everalda that he could not go ashore without leaving specific instructions to the second officer (which is the testimony) concerning the precautions required in the situations, and particularly the necessity for guarding against incident respecting the probable movement of other vessels in standing out to sea from "temporary anchorage" during the early hours of the ensuing day.

■ While there is no specific requirement of the International, Inland or Pilot Rules requiring the presence of an anchor watch (Farwell, Good Seamanship, p. 235), it is none the less a requirement of maritime proficiency, and when the absence of such a watch can be seen to have rendered a collision the more probable, the delinquent vessel has been held at fault even though not anchored in the fairway. The Clara, 102 U.S. 200, 26 L.Ed. 145; The Erastus Corning, D.C., 25 F. 572; The Guyandotte, D.C., 39 F. 575; The Santiago, D.C., 160 F. 742; and The Director, D.C., 180 F. 606.

■ Had an anchor watch been on duty on the Everalda, it could have been expected to note the failure of the anchor lights to function, to have at once notified the sleeping second officer or to have remedied the condition without such notice; and to have observed the approach of the Trader from astern, and to have at least made efforts to warn her of impending danger. In view of the situation as it has been discussed, it seems to me that the Everalda should be held at fault for the breach of the requirement of good seamanship dictated by her position on the night of March 11-12, 1942, in this "temporary anchorage", in that she had no anchor watch.

It results that the libel in the first cause should be dismissed, and that in the second cause the libellant should have the usual interlocutory decree, with one bill of costs.

Settle one decree on notice, in accordance with the foregoing.