**AMERICAN DREDGING CO.**

v.

**CALMAR S. S. CORP.**

**CALMAR S. S. CORP.**

v.

**AMERICAN DREDGING CO.**

**No. 47 of 1952.**

United States District Court
E. D. Pennsylvania.

May 18, 1954.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for American Dredging Co.

Krusen, Evans & Shaw, Philadelphia, Pa., for Calmar S.S. Corp.

CLARY, District Judge.

This action arose out of a collision between the Liberty-type steamship Calmar and an anchored mud scow at 11:43½ P.M. on the night of November 30, 1951, which occurred on the Horseshoe Bend of the Delaware River, approximately opposite the north end of Mustin Field, a part of the Philadelphia Naval Base. From the pleadings and proof I make the following

Findings of Fact

1. Libellant, American Dredging Company, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, its principal office and place of business being located at 12 S. 12th Street, Philadelphia, Pennsylvania.

2. Respondent, Calmar Steamship Corporation, organized and existing under the laws of the State of Delaware, has an office and place of business in Philadelphia, Pennsylvania, at Pier 27 North Wharves.

3. At all times material hereto libellant was the owner of steel dump scows Nos. 102, 103 and 114 (measuring 118 ft. x 34 ft. x 10 ft.) and dump scows Nos. 122, 123 and 125 (measuring 144 ft. x 40 ft. x 11½ ft.).

4. At all times material hereto respondent was the owner and operator of The Calmar, a Liberty-type general cargo vessel, approximately 423 ft. long by 57 ft. wide. Its draft was 7 ft. 6 inches forward and 15 ft. 10 inches aft.

5. At the time of the collision at 11:43½ P.M. on the night of November 30, 1951, the sky was clear. Visibility was 3 miles with a west wind of 9 miles per hour. The tide was flood, having turned at approximately 10:30 P.M. with an upstream current of 1.9 knots per hour. In the Horseshoe Bend a flood tide with a current of 1.9 knots per hour sets toward the Jersey shore.

6. Libellant is engaged in dredging operations in the Delaware River and Bay, both under Government and private contracts. As part of its operations, it customarily moored scows at gathering points along the river, its method of operating being to take loaded scows from the dredging operations to an anchored buoy and there moor them. Other tugs would take the loaded scows from the mooring point to the disposal ground and return with empties. These empties were then taken by the first tug or tugs from the mooring point back to the scene

of the dredging operations to be refilled. From time to time, as its operations required, and for many years past, the libellant had placed such a mooring buoy on the Horseshoe Bend in the Delaware River between channel buoys 46A and 48 to the east of the line of the channel buoys and on the Jersey side of the ship channel. (The linear measurement between the two said buoys, 46A on the south and 48 on the north along the east line of the ship channel is approximately 2800 feet.) The mooring buoy involved in the present action was situate approximately 800 feet north of buoy 46A and at least 200 feet east of the east boundary of the ship channel.

7. That part of the Delaware River which is referred to in the testimony in this action involves the Mifflin Range, the West Horseshoe Range, Horseshoe Bend, and East Horseshoe Range. The ship channel on the Mifflin Range which ends at the confluence of the Schuylkill and Delaware Rivers, immediately to the south of the Philadelphia Naval Base, is 800 feet wide. Upon leaving the Mifflin Range, a vessel bound for Philadelphia is required to make approximately a 45-degree turn to starboard to center on West Horseshoe Range, where the channel width remains at 800 feet. The West Horseshoe Range ends opposite Mustin Field and Horseshoe Bend leads into the East Horseshoe Range. At Horseshoe Bend the channel gradually widens to 1000 feet and a vessel bound for Philadelphia is required to make a gradual change of course of about 60 degrees to port on to the East Horseshoe Range. The point of collision was at approximately the middle of Horseshoe Bend, as indicated on libellant's Exhibit I, sheet 10, of U. S. Engineer Survey of 1943 (Delaware River, Philadelphia, Pennsylvania, to Bombay Hook, Delaware).

8. The aforesaid mooring buoy situate as aforesaid had been in place at the point above designated and had been used by the libellant for at least a few weeks, possibly a few months, prior to the date of the collision. The particular mooring buoy involved was a red cylindrical can, approximately 6 ft. in diameter and 4½ ft. high, unlighted, and secured to a "patent" type anchor weighing approximately 3 tons by a 1½" chain approximately 175 ft. long. Two bridles attached to the buoy would be secured to two of the scows at the mooring point and remaining scows at the point were then lashed to the two secured scows and to each other.

9. On the evening of November 30, 1951, scows Nos. 102, 103, 114, 122, 123 and 125 were attached to the mooring buoy. Their arrival at the mooring buoy was as follows: Scow No. 103 was moored by libellant's tug Hayward at 11:-50 P. M. of the previous day, November 29, 1951; Scows Nos. 122 and 125 were moored by libellant's tug Herron between the hours of 11:30 A. M. and 2 P. M. on November 30, 1951; Scow No. 123 was moored by libellant's tug Emma R at 5:55 P. M. on November 30, 1951; Scow No. 114 was moored by libellant's tug Emma R at 8:25 P. M. on November 30, 1951; Scow No. 102 was moored by libellant's tug Emma R at 11 P. M. on November 30, 1951.

10. At the time of the collision, the above described mud scows, six in number were secured to the mooring buoy and to each other and comprised a flotilla set up as follows: There was a front tier of three mud scows, two of which were attached to the bridles of the mooring buoy, and a third scow secured alongside. There were two scows in the second tier attached to the scows immediately in front of them and to each other, and there was a third tier of one scow attached to the scow immediately in front of it. If the flotilla should be considered in the nature of a right triangle, the altitude would comprise the length of three scows in tandem and the base would comprise the width of three scows abreast. Because of the variance in testimony (no two witnesses agreeing), I cannot fix the exact position of each numbered scow in the flotilla. I do find, however, that the flotilla on the flood tide was tailing generally northward and approximately parallel to the easterly line of the channel.

Scow No. 103 was moored to the mooring buoy and was in the first tier nearest the channel. Because of the conceded damage to them I find that scows Nos. 123 and 102 were the other two scows comprising the first tier, but I cannot state the position of either in the first tier. The evidence demonstrates and I find that the first and second scows of the first tier were secured to the bridles attached to the mooring buoy and that the remaining four scows were secured each to the other and adequately secured for purposes of anchorage and storage.

11. The testimony as to the presence of lights at the time of the collision is uncertain and extremely confusing. From all the conflicting evidence I find that at the moment of collision only one Dietz oil lantern was burning, which lantern was situate on the deck in the middle of scow No. 125 in close proximity to the coaming which surrounds the mud pockets and on the same side as the dumping shaft.

12. The steamship Calmar en route from Brooklyn, New York, to Philadelphia, Pennsylvania, reached Overfalls Light vessel at 5:12 P. M. on November 30, 1951. From that point the navigation was in charge of Captain Ragnvald Kramer, a master mariner and a licensed pilot for the Delaware River and Bay. It passed Reedy Island at 9:14 P. M., Deepwater (Wilmington) Bridge at 10:-05 P. M., Marcus Hook at 10:42 P. M., and at 11:35 P. M. at full maneuvering speed passed Philadelphia Navy Yard. Thereafter and up until the time of the collision its engine movements were as follows: at 11:35 P. M. passing the Philadelphia Navy Yard, full speed (over the ground 11.9 knots); 11:40 P. M. half ahead; 11:41 P. M. stop; 11:42 P. M. slow ahead; 11:43 P. M. full ahead; 11:-44 P. M. stop; 11:46 P. M. half astern. The times set forth above were recorded by the Third Assistant Engineer who was at the engine room telegraph and throttle. The times were taken by glancing at the clock and recorded to the nearest minute, fractions of a minute being disregarded. Entries in the deck log on the other hand were made to the nearest half minute and the deck log shows the following engine movements: 11:40 P. M. half speed and stop engine; 11:42 P. M. slow ahead; 11:42½ P. M. full speed ahead; 11:43 P. M. stop engine; 11:43½ hit barge No. 103; 11:46 P. M. half speed astern.

13. The steamship Calmar, as it navigated the Delaware River from the Mifflin Range and on to and through the West Horseshoe Range immediately to the east of the Philadelphia Naval Base was, as aforesaid, in charge of Captain Kramer, pilot. The vessel carried the usual navigating lights which were lighted, red port, green starboard and white mainmast and foremast lights. On the bridge, in addition to Captain Kramer, were the Master of the vessel, the Third Mate of the vessel, and a helmsman at the wheel which was then under manual operation. An able-bodied seaman, Richard Thomas Shanahan, was on lookout duty at the bow of the vessel. The lookout station was connected by telephone to the bridge. In addition thereto his equipment included a bell for warning purposes.

14. As the steamship Calmar proceeded upriver on the West Horseshoe Range opposite the Philadelphia Naval Base at 10 knots through the water, 11.9 knots over the ground, it faced the following navigational situation.

(a) The tug Caven owned and operated by libellant with two scows in tow was proceeding upriver in the channel but in close proximity to the western edge of the channel on the Pennsylvania side and somewhat to the south of buoy 35.

(b) The tug Phyllis operated by Banks Towing Co. with a barge along her port side was proceeding upriver in the channel close to the New Jersey or easterly line of the channel. It had passed the tug Caven opposite Pier 3 of the Navy Yard and was in line of buoy 46A, whose corrected position as of that date is indicated on libellant's Exhibit I previously described.

(c) A tug, the exact identity of which is unknown, but which was tentatively identified as tug Meteor with a schooner barge in tow on a hawser was proceeding downriver in the channel on the Pennsylvania side and somewhat to the east of the course of the tug Caven.

15. As the steamship Calmar, proceeding at a greater rate of speed than any of the forenamed vessels, overtook the tug Caven, it gave a one-blast whistle signal for a starboard passing, whereupon the tug Caven turned to its port and inside of buoy 35, passing buoy 35 to starboard and outside the limits of the channel. The steamship Calmar proceeded on course, approximately in the center of the channel on West Horseshoe Range, and approached the tug Phyllis, which in the meantime had given way slightly to its left and was turning Horseshoe Bend. The Calmar, then at a distance which cannot be definitely fixed from the testimony but clearly at a distance in excess of 100 yards astern of the tug Phyllis, blew a one-blast whistle signal for a starboard passing. The proposed starboard passing would and did take The Calmar on a course to the channel side of buoy 46A but then somewhat out of the ship channel in order to negotiate such a passing.

16. The tug Phyllis in negotiating Horseshoe Bend turned farther to port and in order to fix its position exactly with reference to the channel turned its somewhat feeble searchlight first on buoy 46A and afterwards on the flotilla of moored scows. Once it had its ranges and bearings on these objects, the light was extinguished and the tug Phyllis proceeded on its course.

17. Before the occurrence of the event related in the preceding paragraph, lookout Shanahan, on duty as aforesaid, perceived on the surface of the river a dark area which to him had all the appearances of being an oil slick, a common condition existing on the Delaware River in and near the port of Philadelphia. This condition was observed by him for a maximum period of two minutes and probably less. He observed no lights of any moored vessel. Those on the bridge of the vessel, the pilot and the captain, who were in a position to see lights, if any, ahead of them, saw no lights. Shanahan did not report the existence of the apparent oil slick to the bridge. When the tug Phyllis turned its searchlight on the flotilla Shanahan for the first time observed the presence of the moored scows, gave the appropriate signal by ringing the bell three times, indicating an object dead ahead, telephoned the bridge, shouted a warning, fell to his knees in the bow, and within seconds the collision occurred. The bow of The Calmar struck scow No. 103 at about the middle mud pocket, cut approximately three-quarters of the distance through the center of the steel scow, and impaled scow No. 103 on its bow. The severe impact damaged the other two scows in the front tier, tore loose the lines joining the flotilla as well as the one bridle attached to the second scow and set the five remaining scows adrift. It required the efforts of several tugs for over one hour to release scow No. 103 from the bow of The Calmar. The Calmar dragged scow No. 103, the mooring buoy, and the anchor into the ship channel as it attempted to maneuver away from the impaled scow.

18. The sole inducing cause of the collision was the failure of the libellant to exhibit at such a height above the hulls of the scows a white light in a lantern so constructed as to show a clear, uniform and unbroken light, visible all around the horizon at a distance of at least one mile.

## Discussion

The above detailed facts represent the conclusions of the Trial Judge from the conflicting and, in many instances, confusing testimony given in this case. A moving vessel came into collision with vessels at anchor. That much is clear from the evidence. The collision which happened on a clear night could have happened only (1) because there were no visible lights on the flotilla or (2) The Calmar either had no lookout or, if it had, he and the officers on the bridge failed to see what was there to be seen.

Taking up a consideration of the first item to be determined—Were there lights on the scows comprising the flotilla?—the testimony of the many witnesses on behalf of the libellant is conflicting and irreconcilable. In brief outline, the libellant undertook to show the condition of the lights on the scows at the mooring for the twenty-three hours preceding the collision and up to and until 11 P. M. on the night of November 30, 1951. It presented no testimony, with the exception of that of the captain of The Phyllis, showing the condition of the lights from 11 P. M. up to the time of the collision. Admittedly there was no one on the scows to serve either as lookout or to keep the lights in proper operating condition. A brief analysis of the testimony of the respective witnesses for the libellant on this point will make the above clear.

Russell Crim, captain of libellant's tug Hayward, brought the scow immediately involved in the collision, No. 103, to the mooring buoy at about 11:50 P. M. on the night of the previous day, November 29, 1951. His testimony is that he placed a lighted lantern on the hatch of that scow at that time.

Oswald H. Craven, relief captain of libellant's tug Arthur N. Herron, was at the mooring at 4 P. M. on November 30, 1951. His testimony as to lights merely states that there were two lights burning on the two head scows at that time and he had no knowledge of how long they had been there or how long they had been burning. When he left the mooring there were five scows secured there.

Robert Neubaum, acting relief captain of libellant's tug Emma R, brought three scows to the mooring on the evening of the collision; one at 5:55 P. M., one at 8:25 P. M. and one at 11 P. M. His only positive testimony is that he left a light on scow 123, but is not absolutely certain whether it was on the hatch or on the deck. He "believed" that another light was on the front corner of scow 102 and "thought" he saw a couple of lights on the unloaded scows but he did not put them there. His testimony, however, is positive to the effect that no staff was provided on any of the scows which would enable a deck hand to hang a lantern above the deck of the scows.

Gus L. Warren, captain of the dredge President, and employed by the Arundel Corporation, not a party to this litigation, was a passenger on libellant's tug Caven, captained by Frank Parker. This tug had proceeded down river on the Pennsylvania side of the channel between 9 and 10 o'clock of the evening of the collision. At the time of the collision it was, as set forth in the foregoing findings of fact, on its way back upstream. On the southbound journey his testimony was that there were three or more lights on the scows then at the mooring. In addition the captain of The Caven threw his searchlight on the mooring and pointed out to him its specific location. He gives no testimony as to the presence of lights on the moored scows on the return trip immediately preceding and up to the time of the collision. He did, however, testify that after the collision and when the scows then adrift were collected, he saw a light on scow 125, located on the deck in the middle of the scow, close to the coaming, and on the same side as the dumping shaft. The photographs introduced in evidence clearly demonstrate that the height of the coaming would veil the light from an observer approaching the scow from the opposite direction. After the collision The Caven also picked up two additional drifting scows and Warren's testimony is positive that he did not see any lights on the two additional scows. Parker testified that on the down river trip there were lights on the scows at the mooring from front to stern and one in the middle. He did not testify as to the presence of any lights on the scows immediately prior to and at the time of the collision. He corroborated Warren as to the presence of the light after the collision on scow 125, but stated specifically that there was no light on scow 123, about which Neubaum had testified. There is no testimony from Parker or any other witness that any unlighted lanterns were taken either from scows 123 or 102 after the collision. When attempt-

ing to maneuver the scow 103 from the bow of The Calmar he observed no light on 103. Further, it was necessary, when he picked up scows 123 and 114 to tow them into dock, for him to furnish lights on the scows for navigational purposes.

Nathaniel Banks, captain of The Phyllis, was the one libellant witness in a position to see within the few minutes preceding the collision whether or not lights were on the moored scows. He passed very closely to them and from his position at the edge of the channel turned his searchlight on the flotilla. Neither at this trial nor at the hearing before the Coast Guard did he ever say that there were any lights on the anchored scows. While generally his testimony lacked positiveness and might tend to create the impression that perhaps there were lights but that since he wasn't looking for them he was unable to testify positively as to the condition of lights at the time of trial, he did state positively before the Coast Guard that he saw no lights on the moored scows up to the time he threw his searchlight upon them. He was the one who towed scow 103 away from the scene of the collision and anchored it in shallow water on the Jersey side. Before doing this it was necessary for him to put his own lantern on it. There is no testimony from him that he found any lantern lighted or unlighted on scow 103.

The two deck hands of the tug Emma R, the last tug at the mooring at 11 P. M., Walter Domanski and Matthew Zaczek, also testified. Domanski testified that at 11 o'clock he put a lantern on scows 123 and 102. He further testified that he saw a light on 103 as the tug approached the mooring buoy and that there were more than three lights on the entire flotilla, but did not specify the number. Zaczek corroborated Domanski as to the lights on scows 123 and 102. He testified further that there were other lights there but gave no exact number and did not notice whether there was any light on 103 as the tug left the mooring at 11 P. M.

As above stated, there was no successful attempt on the part of the libellant to establish the continued burning and visibility of the lanterns alleged to be on the scows between 11 o'clock and the moment of collision. The only testimony, also referred to above, of the presence of any lighted lanterns on the six scows after the collision was the one located as above described on scow 125. So much for the testimony of the libellant with respect to lights.

On behalf of the respondent there was offered the testimony of the three persons who were in a position to see lights, if any there were, on the moored scows. The testimony of all three is positive and unequivocal to the effect that no visible lights were on the scows at the mooring immediately prior to and at the time of the collision. Lookout Shanahan testified specifically as to the absence of lights and stated positively that his first view and knowledge of the moored flotilla came when The Phyllis turned its searchlight upon the mooring. Captain Kramer, the pilot, and Captain Hughes, the master of The Calmar, who were both in a position on the bridge to see lights, testified directly that no lights were there. The navigation of the ship at the time of collision tends to give credence to their story. After hearing the warning, they immediately stopped the engine and with knowledge of some object dead ahead they peered through the darkness ahead but were unable to discern the presence of anything immediately in front of the vessel. The third mate and helmsman, the other two persons on the bridge, were in the wheelhouse and not in a position to determine the presence of lights low on the water and directly ahead.

We have here then a situation where the three persons—the lookout, the master, and the pilot, charged with the responsibility of safe navigation of the moving vessel testified that no visible lights were on the anchored scows at the mooring. With this testimony of lack of any lights, the testimony of Captain Banks becomes very significant. His testimony, in effect, directly corroborates the testimony of the three aboard the steamship Calmar. The absence of any

testimony as to the presence of even unlighted lanterns on any of the scows, except 125, immediately after the collision also is significant. It is rather difficult to reasonably assume that if a lighted lantern was located on each of the then admittedly unlighted scows (a) all would be extinguished by the impact of the collision, or (b) all would be thrown clear of the vessels into the water. Taking into consideration the entire testimony as to lights, I feel that the preponderance of the evidence as to the presence or absence of lights is clearly in favor of the respondent and cross-libellant. As to the one light which I find was burning on scow 125, it is perfectly reasonable to believe that because of its position on the deck alongside the coaming its presence was obscured from the view of those on the approaching vessel. There is no doubt in my mind that the evidence clearly establishes that in no instance did any American Dredging Company employee place a lantern on even a single scow at a sufficient height above the deck of the scow so as to be visible around the horizon for a distance of one mile, as is required by statute. 33 U.S.C.A. § 180. Ordinarily, it is the rule of law that where a moving vessel collides with an anchored vessel, the burden is on the moving vessel to explain the collision. Grauds v. The American Trader, D.C., 88 F.Supp. 45. See also Carr v. Hermosa Amusement Corp. Ltd., 9 Cir., 137 F.2d 983, at page 985, and cases therein cited. Where, however, it appears that the cause of collision was lack of lights on the anchored vessel, the anchored vessel then has the burden of showing that it did have proper lights at and immediately prior to the time of collision. Grauds v. The American Trader, supra. The Buenos Aires, 2 Cir., 5 F.2d 425; The Oliver, D.C., 22 F. 848. Boudreau v. S. S. Herbert L. Pratt, D.C.E.D.Pa., 1928 A.M.C. 498.

The Grauds case above referred to resembles closely in its facts the present case. The Tanker American Trader, bound for sea, struck the Latvian steamship Everalda while she lay at anchor in the anchorage at Stapleton, Staten Island, about 4 A. M. on March 12, 1942. The critical issue to be determined in that case was whether The Everalda was showing anchor lights. As in this case, the testimony of all Trader witnesses was to the effect that she was not. Unlike this case, however, there was a witness, a watchman on the ship, who was in a position to testify as to lights on the anchored ship on the night in question. When he came aboard at 7 P. M. on the evening before two anchor lights were rigged and burning; the aft light was hung by a rope to the flagstaff at the stern and the forward light was "on the stays". Immediately after the collision the witness who was below at the time of the collision, went to the deck, looked at the lanterns and found both to be unlighted. However, his testimony was that when he lowered the lights to the deck and relighted them, the globes of each were warm, not hot, indicating that they had been burning within a reasonably short time before. The court held under the circumstances that the anchored vessel had not maintained its burden of showing that it had complied with the statutory requirements concerning anchor lights and found the anchored vessel solely at fault. Judge Byers made the following pertinent observation, equally applicable to the case at issue.

"The failure of her anchor lights to function during the interval when they could either have prevented the collision at all, or have cast the burden on the Trader, spells out a breach of the Inland Rules, and thereby places her at fault in the absence of such exculpatory evidence as is required according to The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. * * *" [88 F.Supp. 50.]

■ As stated above, it was an absolute obligation of the libellant to have proper anchor lights. With the facts as I have found them, libellant was in a statutory violation at the time of the collision. Mr. Justice Strong in The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, a

case still frequently cited, in speaking of a statutory violation says as follows:

"Concluding then, as we must, that the bark was in fault, it still remains to inquire whether the fault contributed to the collision, whether in any degree it was the cause of the vessels coming into a dangerous position. It must be conceded that if it clearly appears the fault could have nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But, when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collision, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute. * * * "

■ Coming to the second feature of the case as to the presence and adequacy of a lookout on the steamship Calmar, I find from the evidence that Shanahan, an able-bodied seaman, and apparently well-qualified to act as a lookout, was in the forward station at the bow of the vessel and at a place where a lookout should customarily be The Buenos Aires, supra. Despite the derogatory appellations of libellant's brief characterizing this lookout, I find nothing in his actions to merit such criticism. He testified, and it is not denied, that a vessel navigating the Delaware River up to the port of Philadelphia is often confronted in night navigation with dark areas of water which are designated as oil slicks. When he saw a dark area of water directly ahead, he assumed (improperly as it later turned out) that the dark area of water was another of the ordinary and common oil slicks. He had every right to assume that any low lying vessel such as a mud scow, if anchored, would carry the requisite anchor lights prescribed by statute. His assumption that it was an oil slick, therefore, does not strike me as being an unreasonable assumption nor do I consider such assumption negligence of such a character as would constitute fault on the part of the moving vessel. Immediately upon discovery of the presence of the moored scow, he gave a proper warning, the engine was immediately stopped, and thereafter within a matter of seconds the collision occurred. That the steamship Calmar was navigating in the extreme easterly part of the ship channel and that its course would and did take it slightly outside of the channel does not, in my opinion, constitute any fault on the part of the vessel. Certainly, it is no fault of which this libellant can complain. I know of no rule of law which limits the navigation of a vessel to a ship channel, as a land vehicle such as an automobile would be limited to operation on a highway. The Oliver, supra; Eastern Transp. Co. v. U. S., D.C., 29 F.2d 588, 590, 591. The vessel may navigate at any part of a river containing navigable water. Eastern Transp. Co. v. U. S., supra. The charts introduced in evidence would indicate that on flood tide there would be sufficient water for safe passage of a ship of the draft of The Calmar on the course undertaken. Further, although I do not consider it either vital or unduly important to a decision in this case, the mooring buoy was situate outside of the anchorage area prescribed by the Corps of Engineers in and for the Delaware River and Bay. That fact in and of itself would be unimportant and I would not hold that because of that fact alone the libellant could not recover had the flotilla been properly protected by anchor lights. Had they been so protected and been run down by The Calmar there could be no question but that The Calmar would in such a set of circumstances be solely liable for any resultant damage, but we do not have that situation here. Briefly summarized, we have here a case where I am asked to find from

evidence, circumstantial in nature and before the fact, that lights were present at the time of collision because they had been placed there previously. I am asked to find this despite positive testimony that none were. Positive testimony from persons charged with navigation of a moving vessel should not under the law be lightly disregarded. Philadelphia & R. R. Co. v. River & Harbor Imp. Co., 3 Cir., 1910, 183 F. 109; The John H. Starin, 2 Cir., 1903, 112 F. 236.

▮ One final contention of the libellant is that the ship was at fault in merely stopping its engine and in failing to reverse when officers on the bridge had knowledge that an object lay dead ahead. There is no doubt that the order to stop the engine was given immediately upon receipt of the warning from the lookout. A reading of Shanahan's testimony demonstrates that reversing the engine at that point would have been a futile gesture. It also clearly indicates that when he saw the scows he knew that a collision was inevitable so he fell on his knees and braced himself so as not to be thrown when the collision happened. His estimate of the time involved is three-quarters of a minute more or less. Running at maneuvering speed, which it was entitled to do at that point, the distance involved would probably be not more than one ship length. Clearly, no ship of this size could be stopped within that distance, even had a full astern order been immediately given. The testimony of the master of the vessel and of the third assistant engineer is that it would require approximately one-half a minute to stop the engine and put it at full speed astern. That is the exact approximation of time made by the master between the lookout's signal and the collision. It is hornbook law that no one can be criticized for failing to act with precision in an emergency situation created by someone else's fault. Certainly, the one at fault is not entitled to make this complaint.

It appears to me that on the question of liability the weight of the testimony preponderates in favor of The Calmar and, therefore, I conclude that the steamship Calmar was not at fault and the libel should be dismissed. Further, The Calmar is entitled to recover on its cross-libel.

### Conclusions of Law

1.  The Court has jurisdiction of the subject matter and of the parties to this suit.

2.  American Dredging Company was at fault because no scow in the flotilla exhibited an anchor light visible to the approaching Calmar.

3.  The failure of the scows to exhibit proper lights was a statutory fault which was the sole inducing cause of the collision.

4.  The steamship Calmar maintained a proper and vigilant lookout.

5.  Said lookout promptly and efficiently reported the earliest actual sighting of the scows.

6.  Steamship Calmar's speed and navigation were at all times proper.

7.  The normal presumption of fault against a moving vessel created by collision with an anchored vessel has been overcome because the Dredging Company and its vessels committed statutory faults which alone account for the happening of the collision, and the Dredging Company thereafter failed to show, by clear and indisputed evidence, that causative fault was committed by the steamship Calmar.

8.  The libel of American Dredging Company should be dismissed with costs.

9.  The steamship Calmar is entitled to recover on its cross-libel.

10.  A decree may be entered in accordance with the foregoing findings of fact and conclusions of law.